AO 120 (Rev. 08/10)

| TO:  Mail Stop 8<br>**Director of the U.S. Patent and Trademark Office**<br>**P.O. Box 1450**<br>**Alexandria, VA 22313-1450** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT OR**<br>**TRADEMARK** |
|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _____Middle District of Florida_____ on the following

**✖** Trademarks or   ☐ Patents.  (  ☐  the patent action involves 35 U.S.C. § 292.):

| DOCKET NO.<br>6:26-cv-1128-RBD-RMN | DATE FILED<br>May 21, 2026 | U.S. DISTRICT COURT<br>Middle District of Florida | |
|---|---|---|---|
| PLAINTIFF<br><br>SHERGROUP USA, LLC, ET AL. | | DEFENDANT<br><br>CLAIRE SANDBROOK, ET AL | |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK | |
|---|---|---|---|
| 1  see attached am complaint | | | |

| CLERK<br>MEGAN MANN | (BY) DEPUTY CLERK<br>Marisol Norris | DATE<br>May 21, 2026 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Director**     **Copy 3—Upon termination of action, mail this copy to Director**
**Copy 2—Upon filing document adding patent(s), mail this copy to Director**     **Copy 4—Case file copy**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

Shergroup USA, LLC, Intrepid
Services International, LLC,
and One World Services, LLC,

      Plaintiffs,

                                      Case No.:

      v.

Claire Sandbrook and
Shergroup Global Consulting LLC,

      Defendants.

_____/

## COMPLAINT

Plaintiffs, Shergroup USA, LLC ("Shergroup" or "Shergroup USA"), Intrepid Services International, LLC ("Intrepid"), and One World Services, LLC ("One World") (collectively, the "Plaintiffs"), by and through the undersigned counsel, file this Complaint against Defendants, Claire Sandbrook ("Sandbrook" or "Defendant Sandbrook") and Shergroup Global Consulting LLC ("Defendant LLC") (collectively, the "Defendants"), and allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Shergroup USA, LLC is a Florida limited liability company whose principal place of business is currently located at 315 RUCKER STREET, ANNISTON, AL 36205.

1

2.     Shergroup's principal place of business was previously located at 1420 CELEBRATION BLVD, SUITE 200, CELEBRATION, FL 34747; this was Shergroup's principal place of business from April 2012 until October 2025, a majority of the time period during which the actions giving rise to Plaintiff's claims occurred.

3.     Intrepid Services International, LLC is a Florida limited liability company with its principal place of business located at 578 Walden Court, Dunedin, FL 34698. Intrepid is a member of Shergroup and currently owns 20% of the LLC membership interests in Shergroup.

4.     One World Services, LLC is a Florida limited liability company with its principal place of business located at 11401 SW 40th St, Suite 470, Miami, FL 33165. One World is a member of Shergroup and currently owns 55% of the LLC membership interests in Shergroup.

5.     Defendant Claire Sandbrook is an individual who, upon information and belief, resides in Osceola County, Florida. At all material times, Sandbrook personally directed, authorized, and/or actively participated in the acts alleged herein and exercised control over Shergroup Global Consulting LLC, the Defendant LLC. Sandbrook is a dissociated member of Shergroup and holds a 25% economic interest in Shergroup.

6.     Defendant Shergroup Global Consulting LLC is a Florida limited liability company, established in April of 2025, whose principal place of business

2

purports to be 1420 CELEBRATION BLVD, SUITE 200, CELEBRATION, FL 34747.

7.    This action arises under the trademark laws of the United States, 15 U.S.C. § 1051, et seq., and related Florida statutory and common law claims, in addition to Florida claims for breach of contract, breach of fiduciary duties, tortious interference, fraudulent inducement, and judicial expulsion under the Florida Revised Limited Liability Company Act.

8.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law. This Court has supplemental jurisdiction over the remaining claims arising under state laws pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

9.    This Court has general jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193(2) because the Defendants are engaged in substantial and not isolated activity within the state of Florida. Defendant Sandbrook resides and conducts business in Osceola County, Florida, within this District, and the Defendant LLC is a Florida LLC with its principal place of business located in Celebration, Florida, within this District. The Defendants are at home in Florida and subject to general personal jurisdiction in this Court.

10.    This Court furthermore has specific jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193(1)(a):

3

a. The causes of action herein arise out of the Defendants' acts of operating, conducting, engaging in, or carrying on a business in Florida, establishing jurisdiction under <u>Fla. Stat. § 48.193(1)(a)1.</u>;

b. The causes of action herein arise out of the Defendants' tortious acts committed in Florida, establishing jurisdiction under Fla. Stat. § 48.193(1)(a)2.; and

c. The causes of action herein arise out of the Defendant Sandbrook's breach of a contract in Florida, establishing jurisdiction under Fla. Stat. § 48.193(1)(a)7.

11. Venue is proper in this District pursuant to <u>28 U.S.C. § 1391(b)</u> because Defendants reside in this District, a substantial part of the events giving rise to these claims arose in this District, and consumer confusion has occurred and is likely to occur in this District. Venue is further proper in the Orlando Division pursuant to Local Rule 1.04 because the cause of action accrued in Osceola County, Florida, where both Defendants reside and conduct business.

12. All conditions precedent required for bringing this suit have been complied with, waived, or excused.

## FACTUAL BACKGROUND

### Establishment and Early Operations of Shergroup USA

13. Shergroup USA was formed in August of 2011 through the efforts of Defendant Sandbrook. Sandbrook initially established Shergroup USA as solely

4

owned by Shergroup Limited, a company registered and exclusively operated in the United Kingdom.

14. Shergroup USA was formed as a vehicle for conducting Shergroup-branded services in the United States, and at the time of its formation Sandbrook caused Shergroup Limited to be identified in Florida public records as Shergroup's managing entity.

15. Sandbrook is the sole owner of Shergroup Limited. In 2012, Sandbrook transferred sole ownership of Shergroup USA from Shergroup Limited to herself and her husband, Stephen Sandbrook. By 2015 and until 2018, Sandbrook remained the sole member and managing member of Shergroup USA.

16. Prior to the formation of Shergroup USA in 2011, the "Shergroup" name and branding had been used solely in the United Kingdom in connection with the activities of Shergroup Limited.

17. The Shergroup name was not used in U.S. commerce prior to the formation of Shergroup USA in 2011.

18. From and after its formation, Shergroup USA conducted business in the United States using the Shergroup name and brand in connection with its services, and Shergroup's operations under the Shergroup name in the United States have been conducted continuously and exclusively through Shergroup USA since 2011.

19.     Through years of continuous commercial use in the United States, Shergroup has developed substantial goodwill associated with the Shergroup name in U.S. commerce (hereinafter the "Shergroup Goodwill").

20.     Shergroup's business operations included the development and operation of Shergroup-branded websites and other brand-facing materials associated with Shergroup's services.

21.     The Shergroup name, associated branding, and Shergroup-branded web presence constitute valuable business assets used in U.S. commerce exclusively by Shergroup.

**Sandbrook's Management of Shergroup as Sole Member**

22.     From Shergroup's formation in 2011 through May 2022, Sandbrook served as Shergroup's sole member and manager and exercised exclusive control over its operations, contractual relationships, financial accounts, books and records, websites and online presence, and brand-facing assets.

23.     On or about January 3, 2018, while serving as Shergroup's sole member and manager, Sandbrook executed on behalf of Shergroup a Factoring Agreement with AmeriFactors Financial Group, LLC ("AmeriFactors") (the "AmeriFactors Agreement").

24.     The AmeriFactors Agreement obligated Shergroup to factor a minimum annual volume of approximately $2,000,000 in receivables.

25. At no time during Sandbrook's period as sole member and manager of Shergroup did Shergroup have the operating capacity or revenue to satisfy the volume commitments contained in the AmeriFactors Agreement.

26. From January 2018 through Sandbrook's dissociation in May 2025, the operative terms of the AmeriFactors Agreement, including its volume commitments, remained within Sandbrook's exclusive knowledge and control.

**Admission of New Members and Execution of the Operating Agreement**

27. In or about May 2022, Sandbrook caused Shergroup to admit additional members.

28. On or about May 23, 2022, Sandbrook, Intrepid, and One World executed a written Operating Agreement governing Shergroup (hereinafter the "Operating Agreement"). A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

29. Following execution of the Operating Agreement, the membership of Shergroup was as follows:

   a. One World held a 62.5% membership interest, with Enrique Sierra acting as One World's authorized representative;

   b. Sandbrook held a 25% membership interest; and

   c. Intrepid held a 12.5% membership interest, with John Johnson acting as Intrepid's authorized representative.

30. Subsequent to the execution of the Operating Agreement, by agreement among the Members, One World transferred an additional 7.5%

membership interest in Shergroup to Intrepid. As a consequence, the current membership of Shergroup is constituted as follows: (a) One World holds a 55% membership interest; (b) Sandbrook holds a 25% economic interest as a dissociated member, as further described herein; and (c) Intrepid holds a 20% membership interest.

31.    The Operating Agreement provides that Shergroup is a member-managed limited liability company, and appointed Sandbrook and Enrique Sierra as Shergroup's initial Managers. *See* Exhibit A, Articles 5.1, 5.2.

32.    Article 6.2 of the Operating Agreement provides that, for so long as a Member remains a Member of Shergroup, each Member shall receive an initial monthly salary of $3,650, payable in arrears on the last day of each month. *Id.* at Article 6.2.

33.    The Operating Agreement contains restrictive covenants applicable to all Members, and additional restrictive covenants specific to Sandbrook, including:

   a. Article 12.1, titled "Covenant Against Unfair Competition" which prohibits each Member, during and at any time after the termination of the Member's involvement with Shergroup, from using, communicating, disclosing, or disseminating Shergroup's confidential information, and from misappropriating any trade secret of Shergroup;

   b. Article 12.2, titled "Non-Competition" which prohibits each Member, during the Member's involvement with Shergroup and for two (2) years following the termination of that involvement, from engaging in the business of providing services similar to Shergroup's services and from soliciting, inducing, or hiring Shergroup's employees; and

8

c. Sandbrook-specific covenants applicable during a defined "Covenant Period" running through two (2) years after Sandbrook ceases to be a Member of Shergroup, including covenants prohibiting Shergroup Limited from competing with Shergroup in the United States while Sandbrook is involved with Shergroup Limited, prohibiting Sandbrook from disposing of a controlling interest in Shergroup Limited without procuring a covenant from any transferee, and granting Shergroup a right of first refusal as to Sandbrook's shares in Shergroup Limited.

34.     Article 12.4 of the Operating Agreement provides that Shergroup is entitled to specific performance and injunctive relief in the event of a breach or threatened breach of any provision of Article 12, and Article 12.5 provides that the running of the non-compete period is tolled during any period of breach. *See id.* at Articles 12.4, 12.5.

35.     Article 5.4 of the Operating Agreement provides: "A Member has no power to withdraw from the Company, except as otherwise provided in Article 8." *Id.* at Article 5.4.

36.     Article 8 of the Operating Agreement governs only Transfer of Membership Interests by sale (subject to a right of first refusal) and the disposition of a Member's interest on death, incompetency, or bankruptcy. Article 8 does not provide any mechanism for voluntary withdrawal of a Member from Shergroup. *See id.* at Article 8.

37.     In connection with the negotiation, execution of, and entry into the Operating Agreement, Sandbrook represented to Intrepid and One World, and to their authorized representatives, that:

a. Shergroup owned, or held the U.S. rights to, the Shergroup Name and all intellectual property used in Shergroup's U.S. business;

b. Shergroup's websites and digital assets were Shergroup's business assets;

c. Shergroup was not subject to any material undisclosed indebtedness, contingent liability, or contractual obligation that would materially impair Shergroup's operations or capital structure, including without limitation any "loan," advance, or repayment obligation owed to Sandbrook personally or to Shergroup Limited; and

d. Shergroup's financial statements and records, as presented or made available to Intrepid and One World, accurately reflected Shergroup's financial condition.

38. In connection with the foregoing, Sandbrook further affirmatively represented to Intrepid and One World, and to their authorized representatives, that Shergroup was a financially healthy, going concern with positive financial performance, adequate cash position, and stable operational condition sufficient to support the continued operation and growth of the business.

39. Those representations were inaccurate or, at minimum, materially misleading when compared against Shergroup's actual liabilities, operational condition, and cash position, including the undisclosed AmeriFactors volume commitments and the Asserted Loans subsequently claimed by Sandbrook and Shergroup Limited.

40. The representations described in paragraph 36 were material to Intrepid's and One World's decisions to enter into the Operating Agreement, to become Members of Shergroup, and to contribute capital to Shergroup.

10

41. Intrepid and One World relied on Sandbrook's representations in entering into the Operating Agreement, in becoming Members of Shergroup, and in contributing capital to Shergroup.

42. Had Sandbrook disclosed the existence and operative terms of the AmeriFactors Agreement, the alleged "loan" claims that Sandbrook would later assert against Shergroup, or any disputed or contingent claim of ownership in the Shergroup Name by Shergroup Limited or any other entity, Intrepid and One World would not have entered into the Operating Agreement on the terms presented and would not have contributed capital to Shergroup on those terms.

**Events Leading to Sandbrook's Dissociation**

43. Following execution of the Operating Agreement, disputes arose between Sandbrook and the other Members regarding Sandbrook's management of Shergroup's affairs.

44. In her capacity as a Manager of Shergroup, Sandbrook controlled the administration of Member compensation under Article 6.2 of the Operating Agreement. While serving in that capacity, Sandbrook caused Shergroup to pay her own monthly compensation in full, but failed to cause Shergroup to pay the monthly compensation due to Intrepid and One World, with the total unpaid Member compensation owed to Intrepid and One World exceeding $250,000.

45. During the same periods, in order to preserve Shergroup's liquidity, working capital, and ability to satisfy payroll and operating obligations, Intrepid

11

and One World, through their authorized representatives, ceased or significantly reduced their own partner distributions and absorbed the burden of preserving Shergroup's operations.

46.    Sandbrook, by contrast, continued to cause Shergroup to pay her full monthly compensation and to take other distributions for her own benefit, notwithstanding the operational and liquidity pressures that her own conduct had imposed on Shergroup.

47.    Sandbrook's conduct constituted self-dealing and preferential treatment, in breach of her fiduciary duties and the duty of good faith and fair dealing owed to Shergroup and its other Members, and entitles Shergroup to disgorgement of the amounts wrongfully retained by Sandbrook and to recovery on grounds of unjust enrichment in addition to Shergroup's contract and fiduciary remedies.

48.    While serving as a Manager of Shergroup, Sandbrook repeatedly refused to authorize partner-approved rate adjustments necessary to restore profitability on Shergroup's unprofitable client contracts, despite the direction of a Majority in Interest of Shergroup's Members regarding those adjustments, thereby obstructing Shergroup's efforts to stabilize its financial condition.

49.    Sandbrook's mismanagement and obstruction of Shergroup's affairs, together with her conduct described elsewhere herein, led the other Members to

12

conclude by no later than April 2025 that Sandbrook's continued involvement with Shergroup was untenable.

50. In or around May 2025, Sandbrook ceased serving as a member and manager of Shergroup and dissociated from Shergroup.

51. Sandbrook subsequently acknowledged her dissociation in written communications, including in correspondence from her counsel dated October 10, 2025, and Sandbrook does not dispute that she is no longer a member of Shergroup.

52. Sandbrook's purported voluntary withdrawal contravened Article 5.4 of the Operating Agreement, which expressly prohibits any Member from withdrawing from Shergroup except as otherwise provided in Article 8 (which contains no such mechanism).

53. By operation of Fla. Stat. § 605.0603, upon her dissociation Sandbrook's interest in Shergroup converted to a transferee interest only, and Sandbrook ceased to hold any management, governance, voting, or information rights with respect to Shergroup.

54. Following her dissociation, Sandbrook remained bound by the post-termination obligations contained in the Operating Agreement, including the restrictive covenants set forth in Article 12.

**Sandbrook's Post-Dissociation Conduct and Trademark Actions**

55. Following her dissociation, Sandbrook engaged in a sustained course of conduct designed to interfere with Shergroup's operations, to misappropriate the Shergroup Name and the Shergroup Goodwill, and to create confusion and uncertainty regarding the ownership and control of the Shergroup Name in the United States.

56. On or about April 18, 2025—prior to her dissociation, while Sandbrook remained a Member and Manager of Shergroup with continuing fiduciary duties to Shergroup—Sandbrook caused the Defendant LLC to be organized as a Florida limited liability company.

57. Defendant LLC was organized at the address 1420 Celebration Boulevard, Suite 200, Celebration, Florida 34747, which was Shergroup's then-current principal place of business.

58. Sandbrook is the sole member, manager, and registered agent of Defendant LLC, and at all times relevant to this Complaint Defendant LLC has acted under Sandbrook's exclusive control and direction.

59. On or about April 27, 2025, shortly after the formation of Defendant LLC and at or near the time of Sandbrook's dissociation from Shergroup, Sandbrook caused Defendant LLC to file an application with the United States Patent and Trademark Office for registration of the SHERGROUP word mark, designated as Application Serial No. 99157418 (the "SHERGROUP Application").

14

60.     The SHERGROUP Application identified Defendant LLC as the owner of the mark, claimed first use of the mark in commerce as early as July 1, 2007, and submitted as specimens of use screenshots taken from Shergroup's own website, at https://shergroupusa.com, on or about April 27, 2025.

61.     Defendant LLC did not exist prior to April 2025 and could not have used the SHERGROUP mark in U.S. commerce in 2007, in 2013, or at any time prior to its own organization. Nor was the Defendant LLC ever authorized by Shergroup USA to use the SHERGROUP mark.

62.     The specimens submitted in support of the SHERGROUP Application depicted Shergroup-branded U.S. web presence belonging to Shergroup USA, not to Defendant LLC.

63.     The SHERGROUP Application matured into U.S. Trademark Registration No. 8,058,102, issued on or about December 9, 2025 (the "SHERGROUP Registration"). A true and correct copy of U.S. Trademark Registration No. 8,058,102 is attached hereto as Exhibit B. The SHERGROUP Registration remains live and active on the Principal Register of the United States Patent and Trademark Office.

64.     After Sandbrook caused Defendant LLC to obtain the SHERGROUP Registration, Sandbrook, directly and through counsel, advanced inconsistent and contradictory positions regarding the ownership of the Shergroup Name in the United States.

15

65.     In communications and filings made through and on behalf of Defendant LLC, Sandbrook positioned Defendant LLC as the owner of the SHERGROUP mark in the United States.

66.     However, in November 2025, by separate communication made through United Kingdom counsel, Sandbrook asserted on behalf of Shergroup Limited that Shergroup Limited was the owner of the Shergroup mark and that Shergroup USA was merely a licensee of that mark, that Shergroup's purported license to use the Trademark was revocable and had been revoked, and demanded that Shergroup immediately cease use of the Shergroup Name and brand.

67.     Sandbrook's claim that Shergroup Limited owns the Shergroup Name in the United States, and that Shergroup USA is merely a licensee, was further advanced in the written response of Sandbrook's and Shergroup Limited's U.S. counsel dated October 10, 2025, addressed to Shergroup's counsel.

68.     Sandbrook's contradictory ownership positions cannot be reconciled: the SHERGROUP Application and the SHERGROUP Registration assert that Defendant LLC is the owner of the mark in the United States, while Sandbrook's UK counsel simultaneously asserts that Shergroup Limited is the owner. UK counsel's assertion rested upon Shergroup Limited's purported ownership of (a) a 2007/2008 UK trademark registration designated UK00002444189, which the letter expressly admits was "not properly renewed in

16

2017, following the initial 10-year registration;" and (b) two new UK trademark applications, designated UK00004246591 and UK00004246589, filed on August 8, 2025—more than three months after Sandbrook caused Defendant LLC to file the SHERGROUP Application in the United States.

69. Shergroup Limited held no registered trademark in the United Kingdom from 2017 until August 2025. Throughout that entire eight-year period, Shergroup continuously used the Shergroup Name in U.S. commerce, building the Shergroup Goodwill in the United States.

70. Shergroup denies that Shergroup Limited is or has been the owner of the Shergroup Name in the United States, and Sandbrook has produced no evidence of any written license agreement granting Shergroup a revocable right to use the Shergroup Name in the United States.

71. Sandbrook has produced no evidence establishing that any such license of the Shergroup Name to Shergroup existed or lawfully terminated.

72. An abandoned trademark registration in the United Kingdom does not establish trademark rights in the United States. U.S. trademark rights arise from use of a mark in U.S. commerce and from control of the goodwill associated with that use. Neither the lapsed UK registration UK00002444189 nor the post-hoc UK applications UK00004246591 and UK00004246589 creates or establishes any rights in the Shergroup Name in U.S. commerce.

17

73. Since its formation in 2011, Shergroup has continuously used the Shergroup Name in U.S. commerce in connection with its services, including throughout the entire period during which Shergroup Limited held no registered UK trademark, and Shergroup—not Defendant LLC, not Shergroup Limited, and not any other entity—has built, owns, and controls the Shergroup Goodwill in the United States.

74. Sandbrook's shifting and contradictory ownership positions were and are deployed opportunistically to create a cloud on title to the Shergroup Name, to confuse the marketplace as to the source and affiliation of Shergroup-branded services in the U.S., and to interfere with Shergroup USA's operations and transactions.

75. Sandbrook caused Defendant LLC to operate from Shergroup's former principal place of business at 1420 Celebration Boulevard, Suite 200, Celebration, Florida 34747, and to provide services within the same business categories as those provided by Shergroup, including security guard services and related offerings.

76. Defendant LLC's services, branding, and trade dress are confusingly similar to those of Shergroup, and Defendant LLC operates under the same "Shergroup" name and brand that Shergroup has used continuously in U.S. commerce since 2011.

77. After her dissociation, Sandbrook refused, despite repeated formal requests by Shergroup, to provide Shergroup with the access credentials, login information, and administrative controls associated with Shergroup-branded U.S. domains, websites, email systems, and back-end platforms.

78. Shergroup's formal demand for those credentials, transitional documents, and abandonment of the SHERGROUP Application was made by letter dated June 11, 2025, from Shergroup's counsel to Sandbrook, with which Sandbrook failed and refused to comply.

79. Sandbrook's refusal to release those credentials forced Shergroup to establish replacement email and back-end platforms on an emergency basis, at substantial cost, in order to maintain customer communications and continuity of operations.

80. Sandbrook continued to retain administrative control over digital assets associated with Shergroup's U.S. business, including without limitation Shergroup's official Facebook page, which had a following of approximately 11,000 followers as of January 2026.

81. As recently as January 8, 2026, Sandbrook caused promotional content for Shergroup Limited, including video content featuring Sandbrook, to be posted to the Shergroup USA Facebook page.

82. The promotional content posted by Sandbrook to the Shergroup USA Facebook Page was intended to cause, and did cause, confusion among

19

Shergroup's customers and prospective customers as to the source and affiliation of the services being promoted.

83.     Following inquiry by Shergroup, the offending posts were removed from the Shergroup USA Facebook Page, and the page's follower count thereafter decreased by approximately 1,000 followers.

84.     As a direct result of Sandbrook's continued unlawful control of Shergroup-branded U.S. digital assets and her use of those assets to promote Shergroup Limited and Defendant LLC, Shergroup has been required to substantially rebrand its U.S. operations from "Shergroup USA" to "Shergroup Security," to develop a new website, and to incur substantial costs to mitigate continuing consumer and marketplace confusion.

**Undisclosed Loans, the AmeriFactors Fallout, and Additional Misconduct**

85.     Following Sandbrook's dissociation, the remaining Members discovered material facts regarding Sandbrook's conduct during her period of control of Shergroup that had not been disclosed to them prior to or during their entry into the Operating Agreement and admission as Members.

86.     Among other things, after Sandbrook's dissociation, she for the first time asserted that Shergroup owed substantial sums—aggregating in excess of $1,400,000—to Sandbrook personally and to Shergroup Limited, based on alleged "loans" or capital advances allegedly made over a period of years (the "Asserted Loans").

20

87.    The Asserted Loans were not disclosed to Intrepid, to One World, or to their authorized representatives prior to or during the negotiation and execution of the Operating Agreement.

88.    Sandbrook has not produced documentation, books, records, or other competent evidence substantiating the existence, terms, or enforceability of the Asserted Loans, and Shergroup denies the validity, enforceability, and accuracy of the Asserted Loans.

89.    The Asserted Loans, as later claimed by Sandbrook and Shergroup Limited in aggregate amounts exceeding $1,400,000, are facially inconsistent with the manner in which Shergroup's liabilities and operational condition were disclosed at the time Intrepid and One World were admitted as Members and during the related capitalization discussions.

90.    Had obligations of that magnitude in fact existed, Sandbrook was under both a contractual and a fiduciary duty to disclose them, and they would have been required to be reflected in Shergroup's books, financial statements, and the capitalization presentations made to Intrepid and One World. They were not.

91.    Sandbrook's post-dissociation assertion of obligations of this magnitude is itself probative of inducement, concealment, and the lack of credibility of the financial representations on which Intrepid and One World relied in becoming Members of Shergroup, and supports the damages claims set

21

forth in Counts III, XI, and the related declaratory relief sought below. The Asserted Loans, together with Sandbrook's shifting and contradictory ownership claims to the Shergroup Name, were also a principal basis for Pilum's concerns regarding clean title and Shergroup's financial condition and were among the primary factors that ultimately prevented Pilum from closing the Transaction on the previously negotiated terms.

92.     After Sandbrook's dissociation, the remaining Members further learned that, while controlling Shergroup, Sandbrook had caused Shergroup to enter into and remain bound to material contractual obligations that Sandbrook had not disclosed during the negotiation and execution of the Operating Agreement, including without limitation the AmeriFactors Agreement.

93.     The terms and operative obligations of the AmeriFactors Agreement, including its $2,000,000 minimum annual factoring volume commitment, were not disclosed to Intrepid or One World prior to or during their entry into the Operating Agreement, and would have been material to their decision to enter into the Operating Agreement and to contribute capital to Shergroup.

94.     After Sandbrook's dissociation, AmeriFactors asserted defaults under the AmeriFactors Agreement, threatened legal action against Shergroup, and threatened steps that would have interfered with Shergroup's customer and vendor relationships.

95. By correspondence dated September 24, 2025, AmeriFactors issued a buyout and termination letter that asserted Volume Commitment Damages of $238,284.75.

96. Shergroup, through counsel, negotiated a settlement which involved payment of a discounted buy amount of $53,542.67 and termination of the AmeriFactors Agreement and business relationship with AmeriFactors, in order to avoid the threatened interference by AmeriFactors with Shergroup's customer and vendor relationships.

97. As a direct result of Sandbrook's nondisclosure and mismanagement of the AmeriFactors relationship, Shergroup incurred substantial costs and fees, including without limitation attorneys' fees and the buyout payment, in resolving and terminating the AmeriFactors Agreement.

98. While in control of Shergroup, Sandbrook caused Shergroup to enter into other contractual obligations and to make recurring expenditures that were neither disclosed to nor authorized by the other Members, including recurring monthly expenditures to services known as "RampedUp" and "SGI" that, on information and belief, primarily benefited Shergroup Limited and Sandbrook personally rather than Shergroup.

99. Sandbrook caused Shergroup to retain bookkeeping and administrative services from an India-based entity within Sandbrook's control, which services proved materially deficient. As a consequence, Shergroup was

23

required to retain a Florida-based certified public accountant to audit Shergroup's records, reconstruct its accounting books, and restore its internal accounting systems, at substantial cost to Shergroup.

100.    Sandbrook procured corporate insurance for Shergroup that failed to exclude independent contractors with their own coverage, resulting in audits and avoidable financial penalties to Shergroup, with significant financial exposure.

101.    Upon her dissociation, Sandbrook abandoned her management duties at Shergroup without implementing or facilitating any transition plan, resulting in missed Florida Department of Revenue sales tax filings, late penalties, and the need for Shergroup to engage outside professionals to file and pay past-due taxes and fines.

102.    After her dissociation, Sandbrook attempted to access and divert Shergroup's funds without authorization, including by attempting to obtain a disbursement of $66,901.33 in Shergroup funds. The funds were ultimately recovered, but only after Shergroup incurred costs and was required to formally demand return in a civil theft demand letter. The civil theft demand was made by Shergroup's counsel to Sandbrook by letter dated May 21, 2025, pursuant to Fla. Stat. § 772.11, after which Sandbrook returned the funds.

24

### Interference with the Pilum Transaction

103. In 2025, Shergroup negotiated and pursued a proposed sale transaction with Pilum Defense Services, through its acquisition vehicle PAC – SG Acquisition Company, LLC (collectively, "Pilum"), pursuant to which Pilum would acquire 100% of the issued and outstanding membership interests in Shergroup.

104. The proposed Pilum transaction had a total value of approximately $400,000, of which approximately $220,000 was payable in cash at closing and the balance was to be paid through partial seller financing.

105. The Pilum transaction would have provided substantial value to Shergroup and to its Members.

106. On or about September 29, 2025, Pilum, through its counsel, delivered draft acquisition documents to Shergroup based on the parties' negotiated terms, with the Transaction expressly conditioned on the transfer of all issued and outstanding membership interests of Shergroup, including those held by Sandbrook, and on the resolution of all Sandbrook-related asserted claims relating to amounts allegedly due, intellectual property, and an ERC grant transfer (collectively, the "Sandbrook Claims").

107. On or about November 6, 2025, Pilum deposited $220,000 into escrow in anticipation of closing.

108. Sandbrook had actual knowledge of the Pilum transaction, of Pilum's specific timing, structure, and conditions, and of the consequences for Shergroup of disrupting or impairing that transaction.

109. Sandbrook took deliberate actions designed to disrupt, delay, and impede the Pilum transaction, including without limitation:

a. asserting inconsistent and contradictory positions regarding the ownership of the Shergroup Name in the United States, including by causing Defendant LLC to pursue and obtain the SHERGROUP Registration on the one hand, and by directing United Kingdom counsel to assert competing ownership on behalf of Shergroup Limited on the other;

b. advancing the Asserted Loans against Shergroup; and

c. demanding compensation as a condition of removing those impediments and conveying her membership interest.

110. Sandbrook's conduct created uncertainty regarding Shergroup's authority to deliver clean title to its membership interests, the Shergroup Name, and Shergroup's other assets, which uncertainty was material to Pilum's willingness to close the Transaction.

111. By letter dated November 19, 2025, Pilum's counsel informed Shergroup that Pilum's offer would be revoked, and the escrowed funds returned, if the Transaction did not close by November 21, 2025 on the previously negotiated terms requiring conveyance of all membership interests and resolution of the Sandbrook Claims.

112.   As a direct and proximate result of Sandbrook's interference, Shergroup's ability to close the Pilum transaction on the negotiated terms was materially impaired and the Transaction did not close.

113.   Shergroup has incurred and continues to incur damages including, without limitation, the lost transaction value of approximately $400,000, transaction costs, professional and legal fees, harm to its business relationships, and continuing exposure arising from the disputes Sandbrook has manufactured.

**Resulting Harm**

114.   The Defendants' conduct has caused, and continues to cause, Shergroup substantial and ongoing harm.

115.   Defendants' actions have clouded Shergroup's rights in the Shergroup Name and the Shergroup Goodwill; have impaired Shergroup's ability to operate under its established name and identity; have interfered with Shergroup's existing and prospective business relationships and transactions, including the Pilum transaction; and have forced Shergroup to incur substantial costs to protect its rights, to mitigate consumer and marketplace confusion, and to maintain its operations.

116.   The harm caused by the Defendants' misconduct and the failure of the Pilum transaction is concrete and continuing. By way of example only, on or about February 9, 2026, the Brighton, Colorado School District 27J formally notified Shergroup that it would not renew Shergroup's three-year armed

27

security services contract at the conclusion of the 2025–2026 school year and would instead open the contract to competitive process. The 27J contract had been a substantial customer relationship, and its termination is a direct consequence of the disruption to Shergroup's operations, brand, and customer confidence caused by the Defendants' misconduct alleged herein.

117.    Defendants' misconduct, as alleged herein, is ongoing. Without injunctive relief, Sandbrook will continue to use Defendant LLC, the SHERGROUP Registration, the Asserted Loans, and her continuing assertion of contradictory ownership claims to interfere with Shergroup's business and to misappropriate the Shergroup Name, the Shergroup Goodwill, and the value of Shergroup's brand assets.

118.    Plaintiffs have no adequate remedy at law sufficient to fully redress the irreparable harm caused and threatened by Sandbrook's continuing misconduct.

<u>**COUNT I – BREACH OF OPERATING AGREEMENT**</u>
<u>**Article 12.1 – Covenant Against Unfair Competition**</u>
**(Shergroup against Sandbrook)**

119.    Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 28-36, 53-56, 59-63, 77-84, and 114-118 above as though fully set forth herein.

120.    The Operating Agreement is a valid and enforceable contract among Sandbrook, Intrepid, and One World, and is binding upon Shergroup, and at all

28

times relevant to this Count Sandbrook has been bound by the terms of the Operating Agreement, including the covenants set forth in Article 12.

121. Article 12.1 of the Operating Agreement, titled "Covenant Against Unfair Competition," prohibits Sandbrook, during and at any time after the termination of her involvement with Shergroup, from directly or indirectly using, communicating, disclosing, or disseminating Shergroup's confidential information, including without limitation information relating to Shergroup's clients, customers, financial information, marketing strategies, and other proprietary information, and from misappropriating any trade secret of Shergroup. Exhibit A, Article 12.1.

122. Sandbrook materially breached Article 12.1 of the Operating Agreement, including without limitation by:

   a. using Shergroup's confidential information, brand-facing materials, and proprietary website content to obtain the SHERGROUP Registration in the name of Defendant LLC;

   b. retaining and using Shergroup's confidential digital access credentials, login information, and administrative controls associated with Shergroup-branded U.S. domains, websites, email systems, and back-end platforms after her dissociation from Shergroup, and refusing to return or relinquish those credentials and controls to Shergroup; and

   c. using Shergroup's confidential, brand-facing digital assets to publish promotional content for Shergroup Limited and Defendant LLC and to disseminate communications competing with Shergroup USA's business.

123. Sandbrook's breaches of Article 12.1 are continuing.

29

124.    As a direct and proximate result of Sandbrook's breaches, Shergroup has suffered and continues to suffer irreparable harm, including without limitation loss of control over its brand identity, diversion of its goodwill, marketplace and consumer confusion, and disruption of its business relationships and operations, for which there is no adequate remedy at law.

125.    As a direct and proximate result of Sandbrook's breaches, Shergroup has further suffered actual, consequential, and economic damages, including without limitation the costs of establishing replacement digital infrastructure, the costs of rebranding and corrective measures, lost customers and customer relationships, and lost profits.

126.    Pursuant to Article 12.4 of the Operating Agreement, Shergroup is entitled to specific performance and injunctive relief to enforce the provisions of Article 12.1, and pursuant to Article 12.5 of the Operating Agreement, the running of any time-limited covenant under Article 12 is tolled during the period of Sandbrook's continuing breach. *See* Exhibit A, Articles 12.4, 12.5.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendant, Claire Sandbrook, for breach of the Operating Agreement, and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Sandbrook and all other persons acting in concert with Sandbrook from continued breach of Article 12.1 of the Operating Agreement, including without limitation enjoining Sandbrook from any continued use, retention, disclosure, or dissemination of Shergroup's confidential information, trade

secrets, brand-facing assets, digital access credentials, or other proprietary information of Shergroup;

B. An order requiring Sandbrook to deliver to Shergroup all of Shergroup's confidential information, trade secrets, brand-facing assets, digital access credentials, login information, administrative controls, and other proprietary information in Sandbrook's possession, custody, or control, including without limitation administrative control of the Shergroup USA Facebook Page and all Shergroup-branded U.S. domains, websites, email systems, and back-end platforms;

C. An award of all applicable damages under law, including without limitation actual damages, consequential damages, and disgorgement of any profits or benefits Sandbrook has obtained as a result of her breaches;

D. An award of attorneys' fees and costs to the extent available under the Operating Agreement, applicable statute, or otherwise; and

E. Such other relief as the Court deems just and proper.

**COUNT II – BREACH OF OPERATING AGREEMENT**
**Article 12.2 – Non-Competition; Article 12.66 – Sandbrook-Specific Covenants**
**(Shergroup against Sandbrook)**

115. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 28-36, 53-58, 66-67, 75-84, and 114-118 above as though fully set forth herein.

116. The Operating Agreement is a valid and enforceable contract, and at all times relevant to this Count Sandbrook has been bound by the terms of the Operating Agreement, including the covenants set forth in Article 12.

117. Article 12.2 of the Operating Agreement, titled "Non-Competition," prohibits Sandbrook, during her involvement with Shergroup and for two (2) years following the termination of that involvement, from directly or indirectly, for her own account or jointly with another, engaging in the business of

31

providing services similar to Shergroup's services, and from soliciting, inducing, or hiring any person employed by Shergroup. Exhibit A, Article 12.2.

118. Article 12.66 of the Operating Agreement contains additional restrictive covenants specific to Sandbrook, applicable during a defined "Covenant Period" running through two (2) years after Sandbrook ceases to be a Member of Shergroup, including without limitation:

   a. Article 12.66.1, which provides that, for so long as Sandbrook is working with or in any capacity with Shergroup Limited, Shergroup Limited shall not provide services falling within Shergroup's business purpose in the United States during the Covenant Period, and shall not commercialize outside the United States any business concepts falling within Shergroup's business purpose without the unanimous consent of Shergroup's Members; and

   b. Article 12.66.2, which prohibits Sandbrook from undertaking business in the United States under the name of "Shergroup," and from conducting business in the United States that is already being undertaken by Shergroup, in each case without the unanimous consent of Shergroup's Members.

*Id.* at Article 12.66.

119. Sandbrook materially breached Article 12.2 of the Operating Agreement, including without limitation by causing Defendant LLC to be organized at Shergroup's then-principal place of business, to operate under the same "Shergroup" name and brand that Shergroup has used continuously in U.S. commerce since 2011, and to provide services in the same business categories as those provided by Shergroup, including security guard services and related offerings, in direct competition with Shergroup.

120. Sandbrook materially breached Article 12.66 of the Operating Agreement, including without limitation by:

    a. undertaking business in the United States under the name of "Shergroup," and conducting business in the United States already being undertaken by Shergroup, through Defendant LLC and without obtaining the unanimous consent of Shergroup's Members, in violation of Article 12.66.2; and

    b. while remaining involved with Shergroup Limited, causing Shergroup Limited—a UK entity Sandbrook owns and controls—to assert ownership rights in the Shergroup Name in the United States, to demand that Shergroup cease use of the Shergroup Name in the United States, and to publish promotional content for Shergroup Limited through Shergroup-branded U.S. digital assets including the Shergroup USA Facebook Page, all without the unanimous consent of Shergroup's Members and in violation of Article 12.66.1.

121. Sandbrook's breaches of Articles 12.2 and 12.66 are continuing.

122. As a direct and proximate result of Sandbrook's breaches, Shergroup has suffered and continues to suffer irreparable harm, including without limitation loss of control over its U.S. business identity and goodwill, marketplace and consumer confusion, and the impairment of Shergroup's existing and prospective business relationships and transactions, for which there is no adequate remedy at law.

123. As a direct and proximate result of Sandbrook's breaches, Shergroup has further suffered actual, consequential, and economic damages, including without limitation lost transaction value, lost customers and customer relationships, lost profits, and the costs of rebranding and corrective measures.

33

124.    Pursuant to Article 12.4 of the Operating Agreement, Shergroup is entitled to specific performance and injunctive relief to enforce the provisions of Articles 12.2 and 12.66, and pursuant to Article 12.5 of the Operating Agreement, the running of any time-limited covenant under Article 12 is tolled during the period of Sandbrook's continuing breach. *See* Exhibit A, Articles 12.4, 12.5.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendant, Claire Sandbrook, for breach of the Operating Agreement, and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Sandbrook, Defendant LLC, Shergroup Limited, and all other persons acting in concert with any of them from continued breach of Articles 12.2 and 12.66 of the Operating Agreement, including without limitation enjoining (i) Sandbrook from engaging, directly or indirectly, in the business of providing services similar to Shergroup's services for the duration of the period required under Article 12.2 (as tolled by Article 12.5); (ii) Sandbrook from causing or permitting Defendant LLC, Shergroup Limited, or any other entity within her control to undertake business in the United States under the "Shergroup" name or to provide services within Shergroup's business purpose in the United States during the Covenant Period (as tolled by Article 12.5); and (iii) Sandbrook from causing or permitting Shergroup Limited to commercialize outside the United States any business concepts within Shergroup's business purpose during the Covenant Period (as tolled by Article 12.5);

B. A declaratory judgment that the running of any time-limited covenant in Article 12 has been and remains tolled, pursuant to Article 12.5 of the Operating Agreement, during the period of Sandbrook's continuing breach;

C. An award of all applicable damages under law, including without limitation actual damages, consequential damages, and disgorgement of any profits or benefits Sandbrook, Defendant LLC, or Shergroup Limited has obtained as a result of Sandbrook's breaches;

34

D. An award of attorneys' fees and costs to the extent available under the Operating Agreement, applicable statute, or otherwise; and

E. Such other relief as the Court deems just and proper.

**COUNT III – BREACH OF FIDUCIARY DUTY**
**(Shergroup against Sandbrook)**

125. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-32 and 37-118 above as though fully set forth herein.

126. As a Member and Manager of Shergroup, Sandbrook owed Shergroup fiduciary duties under Florida law, including without limitation under Fla. Stat. § 605.04091, and under the Operating Agreement, including without limitation duties of loyalty, care, candor, full disclosure, and good faith and fair dealing.

127. Sandbrook's duties of loyalty to Shergroup included, without limitation, the duties to: (a) refrain from competing with Shergroup in the conduct of its activities and affairs; (b) refrain from dealing with Shergroup, or appropriating to herself or to any entity within her control, any property, opportunity, profit, or benefit derived in connection with Shergroup's activities; (c) account to Shergroup and hold as trustee for Shergroup any property, opportunity, profit, or benefit derived from Shergroup's activities; and (d) disclose all material information regarding Shergroup's affairs and her transactions affecting Shergroup.

128. Sandbrook materially breached her fiduciary duties to Shergroup, including without limitation by:

a. while serving as Shergroup's sole member and manager, causing Shergroup to enter into the AmeriFactors Agreement obligating Shergroup to factor a minimum annual volume of receivables that Shergroup did not have the operating capacity or revenue to satisfy, and failing to disclose the existence and operative terms of the AmeriFactors Agreement to Intrepid and One World at the time of their admission to Shergroup;

b. failing to disclose to Intrepid and One World, at the time of their admission to Shergroup, the existence of the Asserted Loans and any other claimed indebtedness of Shergroup to Sandbrook personally or to Shergroup Limited;

c. while serving as a Manager of Shergroup, causing Shergroup to pay Sandbrook her own monthly compensation in full while failing to cause Shergroup to pay the monthly compensation owed to Intrepid and One World, totaling in excess of $250,000;

d. while serving as a Manager of Shergroup, repeatedly refusing to authorize partner-approved rate adjustments necessary to restore profitability on Shergroup's unprofitable client contracts, despite a majority of Members directing those adjustments;

e. causing Shergroup to retain bookkeeping and administrative services from an India-based entity within Sandbrook's control without disclosing the conflict of interest, and continuing to engage that entity despite materially deficient services that ultimately required Shergroup to incur substantial remediation costs;

f. causing Shergroup to make recurring expenditures to services that primarily benefited Shergroup Limited and Sandbrook personally rather than Shergroup, without disclosure to or authorization from the other Members;

g. procuring corporate insurance for Shergroup that failed to exclude independent contractors with their own coverage, resulting in audits and avoidable financial penalties to Shergroup;

h.  abandoning her management duties at Shergroup upon dissociation without implementing or facilitating any transition, resulting in missed Florida Department of Revenue sales tax filings, late penalties, and remediation costs;

i.  while remaining a Member and Manager with continuing fiduciary duties to Shergroup, causing Defendant LLC to be organized at Shergroup's principal place of business and causing Defendant LLC to file the SHERGROUP Application using specimens taken from Shergroup's own website, all in furtherance of a scheme to misappropriate the Shergroup Name and the Shergroup Goodwill for Sandbrook's personal benefit and the benefit of entities within her control;

j.  retaining and refusing to relinquish to Shergroup, after dissociation, the access credentials, login information, and administrative controls associated with Shergroup-branded U.S. domains, websites, email systems, back-end platforms, and digital assets, including the Shergroup USA Facebook Page;

k.  attempting to access and divert Shergroup's funds without authorization following her dissociation, including by attempting to obtain a disbursement of $66,901.33 in Shergroup funds; and

l.  taking deliberate action to disrupt and impair the Pilum transaction, including by asserting inconsistent and contradictory ownership positions regarding the Shergroup Name, advancing the Asserted Loans against Shergroup, and demanding compensation as a condition of removing those impediments and conveying her membership interest, with the foreseeable and intended effect of causing Shergroup to lose the Pilum transaction.

129.  Sandbrook's breaches of fiduciary duty have been intentional, willful, wanton, oppressive, malicious, and undertaken with conscious disregard of Shergroup's rights, and Sandbrook had actual knowledge of the wrongfulness of the conduct and the high probability of injury and damage to Shergroup, and despite that knowledge intentionally pursued that course of conduct.

37

130. As a direct and proximate result of Sandbrook's breaches of fiduciary duty, Shergroup has suffered and continues to suffer irreparable harm, including without limitation loss of control over its U.S. business identity and goodwill, marketplace and consumer confusion, and the impairment of Shergroup's existing and prospective business relationships and transactions, for which there is no adequate remedy at law.

131. As a direct and proximate result of Sandbrook's breaches of fiduciary duty, Shergroup has further suffered actual, consequential, and economic damages, including without limitation lost transaction value, lost customers and customer relationships, costs incurred to remediate Sandbrook's mismanagement, audits, penalties and remediation costs, costs of establishing replacement digital infrastructure, costs of rebranding and corrective measures, lost profits, and unpaid Member compensation owed to Intrepid and One World.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendant, Claire Sandbrook, for breach of fiduciary duty, and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Sandbrook and all persons acting in concert with Sandbrook from continued breach of her fiduciary duties to Shergroup, including without limitation enjoining Sandbrook from continuing to use, retain, or appropriate Shergroup's confidential information, brand-facing assets, digital access credentials, the Shergroup Name, the Shergroup Goodwill, and the SHERGROUP Registration;

38

B. An order requiring Sandbrook to account to Shergroup for, and to hold as trustee for Shergroup, all property, opportunities, profits, and benefits Sandbrook has derived from her breaches of fiduciary duty, and to disgorge to Shergroup all such property, opportunities, profits, and benefits;

C. An award of all applicable damages under law, including without limitation actual damages, compensatory damages, consequential damages, and disgorgement of profits;

D. An award of punitive damages in light of Sandbrook's intentional, willful, wanton, oppressive, malicious, and conscious disregard of Shergroup's rights;

E. An award of attorneys' fees and costs to the extent available under the Operating Agreement, applicable statute, or otherwise; and

F. Such other relief as the Court deems just and proper.

## COUNT IV – WRONGFUL DISSOCIATION
### Fla. Stat. § 605.0601
### (Shergroup against Sandbrook)

132. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-13, 28-32, 35-36, and 44-118 above as though fully set forth herein.

133. At all relevant times until her dissociation, Sandbrook was a Member of Shergroup.

134. In or around May 2025, Sandbrook dissociated from Shergroup.

135. Sandbrook's dissociation was wrongful within the meaning of Fla. Stat. § 605.0601(2)(b) because:

a. Sandbrook's dissociation was in breach of an express provision of the Operating Agreement, namely Article 5.4, which prohibits any Member from withdrawing from Shergroup except as otherwise

39

provided in Article 8 (and Article 8 contains no mechanism for voluntary withdrawal of a Member); and

b. Sandbrook's dissociation occurred as the result of her willful and persistent material breach of the Operating Agreement and of the duties owed by Sandbrook to Shergroup under Fla. Stat. § 605.04091, as further alleged in Counts I, II, and III above.

*See* Exhibit A, Articles 5.4, 8.

136. Pursuant to Fla. Stat. § 605.0601(3), Sandbrook is liable to Shergroup for damages caused by her wrongful dissociation, in addition to any other obligation owed by Sandbrook to Shergroup.

137. As a direct and proximate result of Sandbrook's wrongful dissociation, Shergroup has suffered, and continues to suffer, substantial damages.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendant, Claire Sandbrook, for wrongful dissociation under Fla. Stat. § 605.0601, and further order as follows:

A. A declaration that Sandbrook's dissociation from Shergroup was wrongful within the meaning of Fla. Stat. § 605.0601(2)(b);

B. An award of all damages caused by Sandbrook's wrongful dissociation, pursuant to Fla. Stat. § 605.0601(3), including without limitation actual damages, compensatory damages, consequential damages, and lost profits;

C. An award of attorneys' fees and costs to the extent available under the Operating Agreement, applicable statute, or otherwise; and

D. Such other relief as the Court deems just and proper.

## COUNT V – TORTIOUS INTERFERENCE
### (Shergroup against Defendants)

138.   Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-84, 89-91, and 103-118 above as though fully set forth herein.

139.   At all relevant times, Shergroup maintained valuable existing and prospective business relationships with third parties, including without limitation prospective and existing customers, vendors, business partners, and prospective acquirers.

140.   By way of example, those relationships included Shergroup's sale transaction with Pilum, Shergroup's customer relationship with the Brighton, Colorado School District 27J, and Shergroup's broader portfolio of customer relationships under the Shergroup Name in U.S. commerce.

141.   Defendants had actual knowledge of these business and prospective business relationships, including by virtue of Sandbrook's role as a Member and Manager of Shergroup, her continuing access to Shergroup's brand-facing assets and information after her dissociation, and her actual knowledge of the timing, structure, and conditions of the Pilum transaction.

142.   Defendants intentionally and without justification interfered with Shergroup's existing and prospective business relationships, including without limitation by asserting inconsistent and contradictory ownership positions

41

regarding the Shergroup Name in the United States, advancing the Asserted Loans against Shergroup, operating Defendant LLC at Shergroup's former principal place of business under the same "Shergroup" name and brand, and retaining and misusing Shergroup's brand-facing digital assets, all in a manner designed and intended to disrupt Shergroup's business and prospective business relationships.

143. Defendants' interference was undertaken intentionally and was not justified or privileged. Defendants undertook the interference for their own personal benefit and the benefit of entities within Sandbrook's control, in furtherance of a scheme to extract value from Shergroup that Defendants were not entitled to receive.

144. As a direct and proximate result of Defendants' interference, Shergroup's business relationships were disrupted, impaired, or terminated.

145. By way of example, Shergroup lost the Pilum transaction, the School District 27J customer relationship, and suffered the loss and impairment of additional existing and prospective customer relationships caused by the consumer and marketplace confusion attributable to Defendants' conduct.

146. As a direct and proximate result of Defendants' interference, Shergroup has suffered and continues to suffer irreparable harm, including without limitation loss of business and contractual relationships, loss of customer goodwill, and reputational harm, for which there is no adequate remedy at law.

147. Defendants' interference has been intentional, willful, wanton, oppressive, malicious, and undertaken with conscious disregard of Shergroup's rights, and Defendants had actual knowledge of the wrongfulness of the conduct and the high probability of injury and damage to Shergroup, and despite that knowledge intentionally pursued that course of conduct.

148. As a direct and proximate result of Defendants' interference, Shergroup has further suffered actual, consequential, and economic damages, including without limitation lost transaction value, lost customers and customer relationships, lost profits, and the costs of mitigating consumer and marketplace confusion.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendants, Claire Sandbrook and Shergroup Global Consulting LLC, for tortious interference with business relationships, and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Defendants and all persons acting in concert with Defendants from continued interference with Shergroup's existing and prospective business relationships, including without limitation enjoining Defendants from continuing to assert contradictory ownership claims to the Shergroup Name, from continuing to advance the Asserted Loans, from continuing to operate Defendant LLC under the "Shergroup" name and brand in the United States, and from continuing to misuse Shergroup's brand-facing digital assets;

B. An award of all applicable damages under law, including without limitation actual damages, compensatory damages, consequential

43

damages, lost profits, and disgorgement of any profits or benefits Defendants have obtained as a result of their interference;

C. An award of punitive damages in light of Defendants' intentional, willful, wanton, oppressive, malicious, and conscious disregard of Shergroup's rights;

D. An award of attorneys' fees and costs to the extent available under applicable statute or otherwise; and

E. Such other relief as the Court deems just and proper.

## COUNT VI – FEDERAL FALSE DESIGNATION OF ORIGIN & UNFAIR COMPETITION 15 U.S.C. § 1125(a)(1)(A) (Shergroup against Defendants)

149. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-84, and 114-118 above as though fully set forth herein.

150. Shergroup owns valid and enforceable rights in the Shergroup Name through continuous and exclusive use in U.S. commerce in connection with its services since 2011. The Shergroup Name functions as a source identifier for Shergroup's services, is distinctive (at minimum through acquired distinctiveness), and is recognized by consumers as identifying Shergroup as the source of those services.

151. Defendants have used in commerce, without authorization, marks, trade dress, and branding that are confusingly similar to and identical with the Shergroup Name in connection with services in the same business categories as those provided by Shergroup, creating a false designation of origin and engaging

in unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

152.   Defendant LLC operates from Shergroup's former principal place of business at 1420 Celebration Boulevard, Suite 200, Celebration, Florida 34747, and provides services within the same business categories as those provided by Shergroup, all under the same "Shergroup" name and brand that Shergroup has used continuously in U.S. commerce since 2011.

153.   Sandbrook has personally used the Shergroup Name in commerce, including by causing the SHERGROUP Application to be filed using specimens taken from Shergroup's website, by causing UK counsel to assert ownership of the Shergroup Name in the United States and to demand that Shergroup cease use of the Shergroup Name, and by retaining and using Shergroup-branded U.S. digital assets including the Shergroup USA Facebook Page to promote services in direct competition with Shergroup.

154.   Sandbrook personally directed, authorized, and actively participated in the conduct alleged herein, and is therefore personally liable as a direct violator of 15 U.S.C. § 1125(a) for her individual acts and is jointly and severally liable with Defendant LLC.

155.   Defendants' unauthorized use of the Shergroup Name has caused, continues to cause, and is likely to cause consumer confusion, mistake, and

45

deception as to the source, sponsorship, affiliation, or approval of Defendants' services.

156.   The confusion is particularly likely because the parties offer identical services under an identical name to the same class of consumers through the same channels of trade, and Defendants even operate from Shergroup's former principal place of business.

157.   As a direct and proximate result of Defendants' conduct, Shergroup has suffered, and continues to suffer, irreparable harm including diversion of customers, loss of goodwill, diminished brand reputation, marketplace and consumer confusion, and other economic and equitable injuries, for which there is no adequate remedy at law.

158. Defendants' misconduct has been intentional and willful. Defendants' bad faith is evidenced, in part, by Sandbrook's misappropriation of Shergroup's website specimens to obtain the SHERGROUP Registration in the name of Defendant LLC; her assertion of inconsistent and contradictory ownership positions regarding the Shergroup Name through Defendant LLC and Shergroup Limited, including the post-hoc filing of UK applications UK00004246591 and UK00004246589 in August 2025 only after Sandbrook had already commenced her trademark misappropriation campaign in the United States; Defendant LLC's operation under the "Shergroup" name at Shergroup's former principal place of business; by Sandbrook's continued retention and

46

misuse of Shergroup's brand-facing digital assets; and by the extensive and ongoing nature of Defendants' unauthorized use of the Shergroup Name as alleged in Paragraphs 49-76 above.

159. Defendants had actual knowledge of the wrongfulness of the conduct and of the high probability that injury and damage to Shergroup would result, and despite that knowledge intentionally pursued that course of conduct, resulting in injury and damage to Shergroup.

160. Defendants committed the misconduct described herein knowingly, willfully, wantonly, oppressively, fraudulently, maliciously, and in conscious disregard of Shergroup's rights.

161. Shergroup is entitled to attorneys' fees and costs in exceptional cases pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendants, Claire Sandbrook and Shergroup Global Consulting LLC, for federal false designation of origin and unfair competition under 15 U.S.C. § 1125(a), and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Defendants and all persons acting in concert with Defendants from continued use of the "Shergroup" name and brand in U.S. commerce, from use of the SHERGROUP Registration, and from use of any mark substantially indistinguishable from or confusingly similar to the Shergroup Name;

B. An award of Shergroup's monetary damages in an amount to be fixed by the Court in its discretion, including without limitation all profits received

47

by Defendants from sales and revenues of any kind made as a result of Defendants' unlawful actions, and all damages sustained by Shergroup as a result of Defendants' actions, this amount to be trebled pursuant to 15 U.S.C. § 1117 because of the exceptional nature of this case resulting from Defendants' deliberate and willful misconduct;

C. An award of reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117 because of the exceptional nature of this case resulting from Defendants' deliberate and willful misconduct;

D. An order that Defendants account to Shergroup for any and all profits earned as a result of Defendants' unlawful conduct;

E. Disgorgement of Defendants' profits; and

F. Such other relief as the Court deems just and proper.

## COUNT VII – CONTRIBUTORY FEDERAL FALSE DESIGNATION OF ORIGIN & UNFAIR COMPETITION
### (Shergroup against Sandbrook)

162. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-84, and 114-118 above as though fully set forth herein.

163. With actual knowledge of ongoing false designation of origin and unfair competition by Defendant LLC, Sandbrook intentionally induced, authorized, and materially contributed to the wrongful acts of Defendant LLC, including by directing Defendant LLC's adoption and use of the "Shergroup" name and brand in U.S. commerce, by causing Defendant LLC to file the SHERGROUP Application using specimens taken from Shergroup's website, and by causing Defendant LLC to operate from Shergroup's former principal place of business under the Shergroup Name in direct competition with Shergroup.

48

164. Sandbrook is the sole member, manager, and registered agent of Defendant LLC, and at all times relevant Defendant LLC has acted under Sandbrook's exclusive control and direction.

165. Sandbrook had actual knowledge of Defendant LLC's wrongful conduct and intentionally induced and directed that conduct by controlling Defendant LLC's branding decisions, marketing, online channels, and continued use of the Shergroup Name.

166. Sandbrook's actions substantially assisted and encouraged the continuation of Defendant LLC's wrongful conduct and resulting consumer confusion, rendering Sandbrook liable for contributory false designation of origin and unfair competition under the Lanham Act.

167. As a direct and proximate result of Sandbrook's contributory conduct, Shergroup has suffered, and continues to suffer, irreparable harm and damages, including without limitation loss of goodwill, diversion of sales, reputational harm, and other commercial injuries, for which there is no adequate remedy at law.

168. Sandbrook's contributory conduct has been intentional and willful. Sandbrook's bad faith is evidenced, in part, by her misappropriation of Shergroup's website specimens to obtain the SHERGROUP Registration in the name of Defendant LLC; her assertion of inconsistent and contradictory ownership positions regarding the Shergroup Name through Defendant LLC and

49

Shergroup Limited; her direction of Defendant LLC's operation under the "Shergroup" name at Shergroup's former principal place of business; her continued retention and misuse of Shergroup's brand-facing digital assets; and the extensive and ongoing nature of the wrongful conduct to which Sandbrook has contributed as alleged in Paragraphs 49-76 above.

169.    Sandbrook had actual knowledge of the wrongfulness of the conduct and of the high probability that injury and damage to Shergroup would result, and despite that knowledge intentionally pursued that course of conduct, resulting in injury and damage to Shergroup.

170.    Sandbrook committed the misconduct described herein knowingly, willfully, wantonly, oppressively, fraudulently, maliciously, and in conscious disregard of Shergroup's rights.

171.    Shergroup is entitled to attorneys' fees and costs in exceptional cases pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiff Shergroup USA, LLC respectfully requests that this Court enter judgment against Defendant Claire Sandbrook for contributory federal false designation of origin and unfair competition under 15 U.S.C. § 1125(a), and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Sandbrook and all persons acting in concert with Sandbrook from continued use of the "Shergroup" name and brand in U.S. commerce, from use of the SHERGROUP Registration, and from use of any mark

substantially indistinguishable from or confusingly similar to the Shergroup Name;

B. An award of Shergroup's monetary damages in an amount to be fixed by the Court in its discretion, including without limitation all profits received by Sandbrook from sales and revenues of any kind made as a result of Sandbrook's unlawful actions, and all damages sustained by Shergroup as a result of Sandbrook's actions, this amount to be trebled pursuant to 15 U.S.C. § 1117 because of the exceptional nature of this case resulting from Sandbrook's deliberate and willful misconduct;

C. An award of reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117 because of the exceptional nature of this case resulting from Sandbrook's deliberate and willful misconduct;

D. An order that Sandbrook account to Shergroup for any and all profits earned as a result of Sandbrook's contributory conduct;

E. Disgorgement of Sandbrook's profits; and

F. Such other relief as the Court deems just and proper.

### COUNT VIII – FLORIDA COMMON LAW TRADEMARK INFRINGEMENT & UNFAIR COMPETITION
### (Shergroup against Defendants)

172. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-84, and 114-118 above as though fully set forth herein.

173. Shergroup owns common-law rights in the Shergroup Name in the State of Florida and elsewhere in the United States through prior and continuous use in connection with its services since 2011. Through such use, Shergroup enjoys exclusive common-law rights in the Shergroup Name.

174. The Shergroup Name functions as a source identifier for Shergroup's services in Florida, is distinctive (at minimum through acquired distinctiveness),

51

and is recognized by consumers as identifying Shergroup as the source of those services.

175. Defendants, without authorization and with knowledge and intentional disregard of Shergroup's rights to the Shergroup Name, have used and continue to use marks and branding identical and confusingly similar to the Shergroup Name in commerce.

176. Defendants' actions have caused, continue to cause, and are likely to cause consumer confusion as to the source, sponsorship, or affiliation of the services offered by Defendants, thus constituting trademark infringement and unfair competition under Florida common law.

177. The confusion is particularly likely because the parties offer identical services under an identical name to the same class of consumers through the same channels of trade, and Defendants even operate from Shergroup's former principal place of business.

178. Sandbrook personally authorized, directed, and controlled the infringing conduct of Defendant LLC, rendering Sandbrook jointly and severally liable for the unlawful acts of Defendant LLC, in addition to her direct liability for her own infringing acts.

179. As a direct and proximate result of Defendants' infringement, Shergroup has suffered, and continues to suffer, irreparable harm and damages, including without limitation loss of goodwill, diversion of sales, harm to brand

integrity and reputation, and other commercial and economic injuries, for which there is no adequate remedy at law.

180. Defendants' infringement has been intentional and willful. Defendants' bad faith is evidenced, in part, by Sandbrook's misappropriation of Shergroup's website specimens to obtain the SHERGROUP Registration in the name of Defendant LLC; Defendants' assertion of inconsistent and contradictory ownership positions regarding the Shergroup Name through Defendant LLC and Shergroup Limited; Defendant LLC's operation under the "Shergroup" name at Shergroup's former principal place of business; Sandbrook's continued retention and misuse of Shergroup's brand-facing digital assets; and the extensive and ongoing nature of Defendants' infringement as alleged in Paragraphs 49-76 above.

181. Defendants had actual knowledge of the wrongfulness of the conduct and of the high probability that injury and damage to Shergroup would result, and despite that knowledge intentionally pursued that course of conduct, resulting in injury and damage to Shergroup.

182. Defendants committed the misconduct described herein knowingly, willfully, wantonly, oppressively, fraudulently, maliciously, and in conscious disregard of Shergroup's rights.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendants, Claire Sandbrook and Shergroup

Global Consulting LLC, for Florida common-law trademark infringement and unfair competition, and further order as follows:

A. A preliminary and permanent injunction enjoining and restraining Defendants and all persons acting in concert with Defendants from continued use of the "Shergroup" name and brand in U.S. commerce, from use of the SHERGROUP Registration, and from use of any mark substantially indistinguishable from or confusingly similar to the Shergroup Name;

B. An award of all applicable damages under law, including without limitation compensatory damages and punitive damages in light of Defendants' intentional, willful, wanton, oppressive, malicious, and conscious disregard of Shergroup's rights;

C. An order that Defendants account to Shergroup for any and all profits earned as a result of Defendants' infringement;

D. Disgorgement of Defendants' profits;

E. An award of attorneys' fees and costs to the extent available under applicable statute or otherwise; and

F. Such other relief as the Court deems just and proper.

## COUNT IX – CANCELLATION OF TRADEMARK REGISTRATION
## 15 U.S.C. § 1119
### (Shergroup against Defendant LLC)

183. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-74, and 114-118 above as though fully set forth herein.

184. Defendant LLC is the owner of record of United States Trademark Registration No. 8,058,102 (the "SHERGROUP Registration"), issued on or about December 9, 2025, on the Principal Register for the SHERGROUP word mark,

54

which matured from Application Serial No. 99157418 filed by Defendant LLC on or about April 27, 2025. *See* Exhibit B.

185.    This action involves the SHERGROUP Registration within the meaning of 15 U.S.C. § 1119 because Defendant LLC relies upon and uses the SHERGROUP Registration in commerce in connection with the acts of false designation of origin, unfair competition, infringement, and related misconduct alleged herein, and because the SHERGROUP Registration has been and continues to be asserted by Defendants and by entities within Sandbrook's control to threaten, disrupt, and impair Shergroup's business and transactions.

186.    Shergroup has been and will continue to be damaged by the continued registration of the SHERGROUP Registration, including without limitation:

   a. Defendant LLC's assertion of presumptive nationwide exclusive rights in the Shergroup Name through the SHERGROUP Registration;

   b. Defendants' use of the SHERGROUP Registration to threaten, deter, or interfere with Shergroup's business operations and transactions, including without limitation the Pilum transaction; and

   c. The existence of the SHERGROUP Registration clouding Shergroup's rights in the Shergroup Name and the Shergroup Goodwill, and impairing Shergroup's ability to operate under its established name and identity in U.S. commerce.

187.    The SHERGROUP Registration is subject to cancellation pursuant to 15 U.S.C. §§ 1064 and 1119 on one or more of the following grounds:

   a. Shergroup has priority of use in the SHERGROUP mark in U.S. interstate commerce, having continuously used the Shergroup Name in

55

connection with its services since 2011, prior to Defendant LLC's filing date, prior to Defendant LLC's registration date, and prior to Defendant LLC's existence;

b. The SHERGROUP mark, as registered to Defendant LLC, so resembles Shergroup's previously used mark as to be likely to cause confusion, mistake, or deception within the meaning of 15 U.S.C. § 1052(d);

c. At the time of filing the SHERGROUP Application, Defendant LLC was not the lawful owner of the SHERGROUP mark and was not entitled to register the mark, in that Defendant LLC did not exist prior to April 2025, had not used the SHERGROUP mark in U.S. commerce at any time prior to its own organization, and had no superior rights to the SHERGROUP mark or to the goodwill associated with the mark; and

d. The SHERGROUP Registration was obtained fraudulently by knowingly false and fraudulent declarations and representations made to the United States Patent and Trademark Office, as further alleged in Count X below.

188. Pursuant to 15 U.S.C. § 1119, this Court has authority to determine the right to registration and to order the cancellation of the SHERGROUP Registration in whole or in part.

189. Based on the foregoing, Shergroup is entitled to an Order directing the Director of the United States Patent and Trademark Office to cancel U.S. Trademark Registration No. 8,058,102.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter an Order, pursuant to 15 U.S.C. § 1119, directing the Director of the United States Patent and Trademark Office to cancel U.S. Trademark Registration No. 8,058,102 in its entirety, and grant such other relief as the Court deems just and proper.

56

## COUNT X – FRAUDULENT PROCUREMENT
## OF TRADEMARK REGISTRATION
## 15 U.S.C. § 1120
### (Shergroup against Defendant LLC)

190. Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-21, 55-74, and 114-118 above as though fully set forth herein.

191. Defendant LLC procured the SHERGROUP Registration by knowingly false and fraudulent declarations and representations to the United States Patent and Trademark Office. *See* Exhibit B.

192. The SHERGROUP Application, filed by Defendant LLC on or about April 27, 2025, contained the following knowingly false and fraudulent declarations and representations:

a. The SHERGROUP Application identified Defendant LLC as the owner of the SHERGROUP mark. This representation was false because, at the time of filing, Defendant LLC had been in existence for approximately nine days, had not used the SHERGROUP mark in U.S. commerce at any time, and was not the lawful owner of the SHERGROUP mark or of the goodwill associated with the mark.

b. The SHERGROUP Application claimed first use of the SHERGROUP mark in commerce as early as July 1, 2007. This representation was false because Defendant LLC was not formed until April 18, 2025, did not exist in 2007 or in 2013, and could not have used the SHERGROUP mark in commerce at the dates claimed.

c. The SHERGROUP Application submitted as specimens of use screenshots taken from Shergroup's own website on or about April 27, 2025. The specimens depicted Shergroup-branded U.S. web presence belonging to Shergroup, not to Defendant LLC, and were false specimens to the extent they purported to demonstrate Defendant LLC's use of the SHERGROUP mark in commerce.

57

193. Sandbrook, the sole member, manager, and registered agent of Defendant LLC, exercises exclusive control over Defendant LLC's affairs and was personally responsible for the false and fraudulent declarations and representations made in the SHERGROUP Application, and Sandbrook's knowledge of their falsity is imputed to Defendant LLC.

194. Sandbrook had actual knowledge of the falsity of the declarations and representations described in Paragraph 192, including without limitation by virtue of (a) her formation and exclusive control of Defendant LLC; (b) her control of Shergroup since 2011 and her resulting personal knowledge that the Shergroup Name had been used in U.S. commerce by Shergroup, not by Defendant LLC, since 2011; (c) her personal knowledge that Defendant LLC did not exist prior to April 2025; and (d) her direction of the use of Shergroup's own website specimens in the SHERGROUP Application.

195. Defendant LLC made the false and fraudulent declarations and representations described in Paragraph 192 with the intent to deceive the United States Patent and Trademark Office and to induce the Office to grant the SHERGROUP Registration to Defendant LLC.

196. The United States Patent and Trademark Office relied on the false and fraudulent declarations and representations made by Defendant LLC in granting the SHERGROUP Registration, U.S. Trademark Registration No. 8,058,102, on or about December 9, 2025.

197. Defendant LLC procured the SHERGROUP Registration by means of the false and fraudulent declarations and representations described herein.

198. As a direct and proximate result of Defendant LLC's fraudulent procurement of the SHERGROUP Registration, Shergroup has been injured and has sustained substantial damages, including without limitation lost transaction value, lost customers and customer relationships, lost profits, costs of rebranding and corrective measures, costs incurred to address marketplace and consumer confusion attributable to the SHERGROUP Registration, attorneys' fees and costs incurred in addressing the SHERGROUP Registration, and other consequential damages.

199. Defendant LLC's fraudulent procurement of the SHERGROUP Registration has been intentional, willful, wanton, oppressive, malicious, and undertaken with conscious disregard of Shergroup's rights.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendant, Shergroup Global Consulting LLC, for fraudulent procurement of trademark registration under 15 U.S.C. § 1120, and further order as follows:

A. An award of all damages sustained by Shergroup in consequence of Defendant LLC's fraudulent procurement of the SHERGROUP Registration, pursuant to 15 U.S.C. § 1120, including without limitation actual damages, compensatory damages, consequential damages, and lost profits;

59

B. An award of punitive damages in light of Defendant LLC's intentional, willful, wanton, oppressive, malicious, and conscious disregard of Shergroup's rights;

C. An award of reasonable attorneys' fees and costs to the extent available under applicable law; and

D. Such other relief as the Court deems just and proper.

## COUNT XI – FRAUDULENT INDUCEMENT
### (Intrepid and One World against Sandbrook)

200. Plaintiffs, Intrepid and One World, hereby reallege and incorporate by reference the allegations set forth in Paragraphs 1-13, 22-32, 37-42, 56-74, 85-102, and 114-118 above as though fully set forth herein.

201. In connection with the negotiation, execution of, and entry into the Operating Agreement, Sandbrook made material representations of fact to Intrepid and One World concerning, among other things, Shergroup's ownership of the Shergroup Name and related intellectual property, the absence of material undisclosed indebtedness or contingent liabilities of Shergroup, and the accuracy of Shergroup's financial statements and records, as further alleged in Paragraph 36 above.

202. Sandbrook's representations were false, including without limitation because (a) Sandbrook subsequently asserted that Shergroup did not own the Shergroup Name in the United States and that Shergroup Limited and Defendant LLC owned the SHERGROUP mark; (b) Sandbrook had caused Shergroup to enter into the AmeriFactors Agreement obligating Shergroup to factor a

60

minimum annual volume of receivables that Shergroup did not have the operating capacity or revenue to satisfy; and (c) Sandbrook subsequently asserted the existence of the Asserted Loans, aggregating in excess of $1,400,000, that had not been disclosed to Intrepid or One World.

203. Sandbrook knew her representations were false at the time she made them, or made them with reckless disregard for their truth or falsity. Sandbrook had personal knowledge of all matters concerning her representations because Sandbrook had served as Shergroup's sole member and manager from 2011 through May 2022 and had exclusive control over Shergroup's operations, contracts, financial records, and intellectual property at all times prior to and during the negotiation and execution of the Operating Agreement.

204. Sandbrook made the false representations with the intent to induce Intrepid and One World to enter into the Operating Agreement, to become Members of Shergroup, and to contribute capital and other resources to Shergroup.

205. Intrepid and One World justifiably relied on Sandbrook's representations in entering into the Operating Agreement, in becoming Members of Shergroup, and in contributing capital and other resources to Shergroup. Intrepid and One World would not have agreed to enter into the Operating Agreement and become members of Shergroup if the representations relied upon had not been made.

206. As a direct and proximate result of Sandbrook's false representations, Intrepid and One World have suffered substantial damages, including without limitation the value of the capital, time, expertise, and resources contributed to Shergroup in reliance on Sandbrook's false representations, and the consequential losses suffered as a result of Sandbrook's misconduct that flowed directly from the inducement.

207. Sandbrook's conduct has been intentional, willful, wanton, oppressive, malicious, and undertaken with conscious disregard of Intrepid and One World's rights, and Sandbrook had actual knowledge of the wrongfulness of her conduct and of the high probability of injury and damage to Intrepid and One World, and despite that knowledge intentionally pursued that course of conduct.

WHEREFORE, Plaintiffs, Intrepid Services International, LLC and One World Services, LLC, respectfully request that this Court enter judgment against Defendant, Claire Sandbrook, for fraudulent inducement, and further order as follows:

A. An award of all applicable damages under law, including without limitation actual damages, compensatory damages, consequential damages, and the value of all capital, time, expertise, and resources contributed by Intrepid and One World to Shergroup in reliance on Sandbrook's false representations;

B. An award of punitive damages in light of Sandbrook's intentional, willful, wanton, oppressive, malicious, and conscious disregard of Intrepid and One World's rights;

C. An award of attorneys' fees and costs to the extent available under applicable statute or otherwise; and

D. Such other relief as the Court deems just and proper.

### COUNT XII – DECLARATORY JUDGMENT
### 28 U.S.C. § 2201
**(Shergroup against Defendants)**

208.   Shergroup hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1-13, 22-74, 85-93, and 114-118 above as though fully set forth herein.

209.   Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has the authority to declare the rights and other legal relations of the parties on the actual controversies presented in this case.

210.   An actual, justiciable, and substantial controversy exists between Shergroup and Defendants regarding, among other things, (a) the ownership and control of the Shergroup Name in U.S. commerce; (b) the existence and effect of any purported license from Shergroup Limited authorizing Shergroup's use of the Shergroup Name in the United States; (c) the existence, validity, and enforceability of the Asserted Loans; (d) the nature and scope of Sandbrook's continuing interest in Shergroup following her dissociation; and (e) the tolling of the time-limited covenants in Article 12 of the Operating Agreement.

211.   Shergroup is entitled to declarations from this Court resolving each of these controversies, including without limitation the following declarations:

a. that Shergroup is the sole owner of all U.S. trademark rights in the Shergroup Name and the Shergroup Goodwill, and that neither Defendant LLC nor Shergroup Limited owns any rights in the Shergroup Name or the Shergroup Goodwill in the United States;

b. that no license from Shergroup Limited authorizing Shergroup's use of the Shergroup Name in the United States has ever existed, or alternatively, that no such license has been validly terminated;

c. that the Asserted Loans are unenforceable, invalid, and not owed by Shergroup, in whole or in part, for lack of documentary substantiation, lack of authorization, lack of consideration, or any other applicable legal basis;

d. that, by operation of Fla. Stat. § 605.0603 and as a consequence of Sandbrook's dissociation from Shergroup, Sandbrook's interest in Shergroup is solely a transferee interest entitling Sandbrook only to receive distributions if and when made by Shergroup, and that Sandbrook holds no management, governance, voting, or information rights with respect to Shergroup; and

e. that, pursuant to Article 12.5 of the Operating Agreement, the running of any time-limited covenant in Article 12 of the Operating Agreement has been and remains tolled during the period of Sandbrook's continuing breach of Article 12.

212. The declarations sought are necessary to remove the cloud on Shergroup's rights in the Shergroup Name and the Shergroup Goodwill, to clarify the rights and obligations of the parties, to enable Shergroup to operate without continued interference from Defendants, and to prevent further harm to Shergroup.

WHEREFORE, Plaintiff, Shergroup USA, LLC, respectfully requests that this Court enter judgment against Defendants, Claire Sandbrook and Shergroup Global Consulting LLC, pursuant to 28 U.S.C. §§ 2201 and 2202, and further order as follows:

64

A. A declaration that Shergroup is the sole owner of all U.S. trademark rights in the Shergroup Name and the Shergroup Goodwill, and that neither Defendant Claire Sandbrook nor Shergroup Global Consulting LLC nor Shergroup Limited owns any rights in the Shergroup Name or the Shergroup Goodwill in the United States;

B. A declaration that no license from Shergroup Limited authorizing Shergroup's use of the Shergroup Name in the United States has ever existed, or alternatively, that no such license has been validly terminated;

C. A declaration that the Asserted Loans are unenforceable, invalid, and not owed by Shergroup, in whole or in part;

D. A declaration that, by operation of Fla. Stat. § 605.0603 and as a consequence of Sandbrook's dissociation from Shergroup, Sandbrook's interest in Shergroup is solely a transferee interest entitling Sandbrook only to receive distributions if and when made by Shergroup, and that Sandbrook holds no management, governance, voting, or information rights with respect to Shergroup;

E. A declaration that, pursuant to Article 12.5 of the Operating Agreement, the running of any time-limited covenant in Article 12 of the Operating Agreement has been and remains tolled during the period of Sandbrook's continuing breach of Article 12;

F. Further necessary or proper relief based on the declarations entered, pursuant to 28 U.S.C. § 2202, including without limitation orders enforcing the declarations against Defendants and any persons acting in concert with Defendants;

G. An award of attorneys' fees and costs to the extent available under applicable statute or otherwise; and

H. Such other relief as the Court deems just and proper.

65

**DEMAND FOR JURY TRIAL**

Plaintiffs, Shergroup USA, LLC, Intrepid Services International, LLC, and

One World Services, LLC, hereby demand a trial by jury on all issues so triable as

a matter of right.

Dated: <u>May 19, 2026.</u>

Respectfully submitted,

/s/ Julia Hannah Weber
Julia Hannah Weber
LEAD COUNSEL FOR PLAINTIFFS
Florida Bar No. 1045592
**SOUTHRON FIRM, P.A.**
400 N. Ashley Drive, Suite 1720
Tampa, Florida 33602
Tel. (813) 773-5105
Fax (813) 683-4338
julia.weber@southronfirm.com
eservice@southronfirm.com

Joseph F. Southron, Esq.
Florida Bar No. 122109
**SOUTHRON FIRM, P.A.**
400 N. Ashley Drive, Suite 1720
Tampa, Florida 33602
Tel. (813) 773-5105
Fax (813) 773-5103
joe@southronfirm.com
eservice@southronfirm.com

*Attorneys for Plaintiffs*

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## SHERGROUP USA, LLC
### A Member-Managed Limited Liability Company

THIS OPERATING AGREEMENT is made and entered into this 23rd day of May 2022, by and among: Claire Sandbrook, One World Services, LLC a FL LLC, and Intrepid Services International, LLC a FL LLC (collectively referred to in this agreement as the "Members").

Accordingly, in consideration of the conditions contained herein, the Members agree as follows:

## ARTICLE 1
## THE LIMITED LIABILITY COMPANY

**1.1 Formation.** SHERGROUP USA, LLC (the "Company") was formed in accordance with the Florida Revised Limited Liability Company Act (the "Act"). A Certificate of formation was filed with the Florida Secretary of State.

**1.2 Name.** The name of the Company is SHERGROUP USA, LLC.

**1.3 Business Purpose.** Subject to the proviso the purpose of the Company is to conduct any and all lawful business PROVIDED THAT the Company will never conduct business as a digital marketing agency.

**1.4 Registered Office.** The location of the registered office of the Company shall be: 1420 Celebration Blvd – Suite 200, Celebration, Florida, 34747.

**1.5 Term.** The Company shall continue perpetually unless sooner terminated.

**1.6 Registered Agent.** Claire Louise Sandbrook is the Company's initial registered agent in the State of Florida.

**1.7 Names and Addresses of Members.** The Members' names and addresses are attached as Schedule 1 to this Agreement.

**1.8 Admission of Additional Members.** Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the written consent of the Majority in Interest of the Members. Any such admission of Additional Members shall be on such terms and conditions as shall be determined by the Members in their sole discretion. Each Additional Member shall only be admitted if they shall have executed this Agreement or an appropriate amendment to it in which he agrees to be bound by the term and provisions of this Agreement as they may be modified by that amendment. Unless otherwise agreed by a Majority in Interest of the Members, upon the appointment of Additional Members the Members percentage interests in the Company shall be diluted equally.

## ARTICLE 2

## CAPITAL CONTRIBUTIONS

2.1 **Initial Contributions**. The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement. The agreed value of such property is $1 Dollar per Membership Unit.

2.2 **Additional Contributions**. No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3 **No Interest on Capital Contributions.** Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

## ARTICLE 3

## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1 **Profits/Losses**. For financial accounting and tax purposes, the Company's net profits or losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation 1.704-1.

3.2 **Distributions**. The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation 1.704.1(b)(2)(ii)(d).

3.3 **No Right to Demand Return of Capital.** No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## ARTICLE 4

## INDEMNIFICATION

The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the

Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful

## ARTICLE 5
## POWERS AND DUTIES OF MANAGERS

### 5.1 Management of Company.

5.1.1 The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs or to appoint such of their number as they deem appropriate to act as a Manager.

5.1.2 Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed by a Majority in Interest of the Members.

5.1.3 Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a Majority in Interest of the Members to manage and operate the business and affairs of the Company.

5.2 **Manager Appointments.** In accordance with their powers contained within clause 5.1 above, the Members have agreed at this time to appoint Claire Louise Sandbrook and Enrique Sierra to be the Managers who shall, on behalf of the Members, (a) manage the day to day running of the Company; (b) undertake such management duties as are required in order for them to comply with Article 7 below; and (c) any other management powers as the Members which to bestow upon the Managers from time to time.  The Managers acknowledge that any power of management in respect of the Company that is bestowed upon them by the Members can be withdrawn by the Members at any time and without any justification.

5.3 **Decisions by Members.** Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a Majority in Interest of the Members.

**5.4 Withdrawal by a Member.** A Member has no power to withdraw from the Company, except as otherwise provided in Article 8.

## ARTICLE 6

### SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1 **Organization Expenses**. All expenses incurred in connection with organization of the Company will be paid by the Company.

6.2 **Salary**. For so long as they are a Member, each of the Members shall receive an initial monthly salary of $3,650 each month, which is to be paid, in arrears, on the last day of each month.

6.3 **Legal and Accounting Services**. The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## ARTICLE 7

### BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS,

### FISCAL YEAR, BANKING

7.1 **Method of Accounting**. The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes, until such time the Manager(s) decide on a different method.

7.2 **Fiscal Year; Taxable Year**. The fiscal year and the taxable year of the Company is the calendar year.

7.3 **Capital Accounts**. The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4 **Banking**. All funds of the Company will be deposited in a separate bank account or accounts in the name of the Company as determined by the Manager(s). Company funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government.

## ARTICLE 8

### TRANSFER OF MEMBERSHIP INTEREST

8.1 **Sale or Encumbrance Prohibited**. Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a Majority in Interest of the other non-transferring Members.

8.2 **Right of First Refusal**. Notwithstanding Article 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1 The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2 For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3 Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not occur more than 120 days after expiration of the 30-day notice period.

8.2.4 If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Article 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period describe above, then the provisions of Article 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5 Notwithstanding the foregoing provisions of Article 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Article 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3 **Substituted Parties**. Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

8.3.1 The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to affect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

8.3.2 The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4 **Death, Incompetency, or Bankruptcy of Member**. On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under

Article 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a Majority in Interest of the Members admit the transferee as a fully substituted Member in accordance with the provisions of Article 8.3.

8.4.1 Any transfer of Economic Rights pursuant to Article 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5 **Death Buy Out**. Notwithstanding the foregoing provision of Article 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Article 8.5.

8.5.1 The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Article 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2 If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Article 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers

cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3 Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Article 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4 At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company.

8.5.5 At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6 On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then existing Ownership Interests.

## ARTICLE 9

## DISSOLUTION AND WINDING UP OF THE COMPANY

9.1 **Dissolution**. The Company will be dissolved on the happening of any of the following events:

9.1.1 Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2 The unanimous agreement of all of the Members;

9.1.3 By operation of law; or

9.1.4 The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2 **Winding Up**. On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Article 3 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1 To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members;

9.2.2 To the payment and discharge of any Company debts and liabilities owed to Members; and

9.2.3 To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member under this Agreement.

## ARTICLE 10
## REMOVAL OF A MEMBER

10.1 **Dismissal.** Any Member may be immediately expelled for cause (as defined in Article 10.2 below) upon a unanimous vote of the remaining Members.

10.2 **Cause** shall be defined as: (i) the commission of a felony or a crime involving moral turpitude or the commission of any other act or omission involving dishonesty or fraud with respect to the Company or any of its affiliates or any of their customers or suppliers; (ii) substantial failure on the part of Member in his performance of the duties (other than any such failure resulting from Member's incapacity due to physical or mental illness), after notice to Members and a reasonable opportunity to cure; (iii) gross negligence or willful misconduct by Member with respect to the Company or any of its affiliates (including, without limitation, disparagement that adversely affects the reputation of the Company or any of its affiliates); or (iv) any material breach by Executive of this this Agreement. For purposes of this Agreement, an act, or failure to act, on the Member's part shall be considered "gross negligence" or "willful misconduct" only if done, or omitted, by him not in good faith and without reasonable belief that his action or omission was in the best interest of the Company and its affiliates. The Member shall not be relieved of their position for "Cause" unless the Company shall have given or delivered to the Member (A)

reasonable notice setting forth the reasons for the Company's intention to remove the Member for "Cause"; (B) a reasonable opportunity, at any time during the 30 day period after the Member receipt of such notice, for the Member, together with their counsel, to be heard before the other Members.

**10.3 Selling the Units.** On a Member no longer being a Member ('**Departing Member'**), due to their removal in accordance with Article 10.1, the Departing Member's interest in the Company (**'Interest'**) shall be dealt with as follows:

10.3.1 For a period of 180 days (**'Period**) after the departure, under Article 10.1, the Members may acquire all, but not less than all, of the Interest at the Fair Market Value (as defined in Article 10.4). If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

10.3.2 Closing of the sale of the Interest will occur within the Period.

10.3.3 If the other Members fail or refuse to notify the Departing Member of their desire to acquire all of the Interest proposed to be transferred within the Period, then the Members will be deemed to have waived their right to acquire the Interest, and the Departing Member may sell and convey the Interest to any other person or entity; provided, however, should the sale to a third person be at a price that is less than the Fair Market Value, then the Departing Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the Period, then the provisions of Article 10.3 will again apply to the Interest proposed to be sold or conveyed.

10.3.4 Notwithstanding the foregoing provisions of Article 10.3, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Article 10.3, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

**10.4 BUYOUT PRICE.** For the purpose of this Article 10 and deciding the Fair Market Value, the Period that they wish to acquire the Interest, unless otherwise agreed, jointly conduct a valuation for the purpose of determining the Fair Market Value. For such valuation, Members shall be obligated to jointly nominate an independent and competent appraiser ("Independent Expert") from Grant Thornton, Ernst & Young, KPMG, Deloitte or PWC, or any other mutually agreed upon company within the Period. Within thirty (30) days of the date of their nomination, the Independent Expert shall make their determination of the Fair Market Value in a written report setting forth detailed reasons for such determination. The Fair Market Value so determined by the Independent Expert shall binding on the Parties and the Parties shall carry out the sale and purchase.

## ARTICLE 12

## NON-COMPETE

**12.1 Covenant Against Unfair Competition.** (a) The Members acknowledge that pursuant to their positions and/or involvement with the Company, their involvement with the Company is unique and extraordinary and, as a result, the Members will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Members to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 12.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Members agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Member during their involvement with the Company, without the prior written consent of the Company; provided, however, that the Member understand that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

**12.2 Non-Competition.** The Members agree that during their involvement with the Company and for a period of two (2) years following the termination of their involvement with the Company (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

(a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing, specific plans to engage.

(b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any

person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period preceding the termination of the Restrictive Covenant Party's involvement with the Company.

12.3 The Member recognize the importance of the covenants contained in this Article 12 and acknowledges that, in view of the Member' interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Member' rights as an individual and/or entity. The Member acknowledge and agree that the covenants contained in this Article 12. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the Member, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 12.

12.4 If the Member commit a breach or threaten to commit a breach of any of the provisions of this Article 12, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

12.5 If any covenant contained in this Article 12, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Member breach the covenants set forth in this Article 12, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 12 shall survive the expiration and termination of this Agreement, and the termination of the Member' involvement with the Company hereunder.

12.66 For the period commencing on the date of this Agreement and ending 2 (two) years from the date that Claire Louise Sandbrook is no longer a Member of Shergroup USA, LLC howsoever this may happen (the 'Covenant Period'), Claire Louise Sandbrook covenants with Shergroup USA, LLC as follows:

12.66.1 For so long as Claire Louise Sandbrook is working as/with/at or in any other capacity with Shergroup Limited, Shergroup Limited shall not, during the Covenant Period, provide services falling within the Business Purpose of Shergroup USA, LLC in the United States of America, and shall not commercialize, outside of the United States of America, business concepts which fall within the Business Purpose of Shergroup USA, LLC, or first developed by Shergroup USA, LLC, without the unanimous consent of the Shergroup USA, LLC's Members;

12.6.2 during the Covenant Period, Claire Louise Sandbrook shall not dispose of a Controlling Interest in Shergroup Limited without having first procured that a direct covenant is given by Shergroup Limited to Shergroup USA, LLC with Shergroup Limited covenanting that it shall not, during the Covenant Period, (a) provide services falling within the Business Purpose of Shergroup USA, LLC in the United States of America; (b) shall not commercialize, outside of the United States of America, business concepts which fall within the Business Purpose of Shergroup USA, LLC or first developed by Shergroup USA, LLC, without the unanimous consent of the Shergroup USA, LLC's Members; (c) shall not undertake business in the United States of America under the name of Shergroup and (d) unless unanimous consent of the Shergroup USA, LLC Member's, at that time and that are entitled to vote, has first been obtained, not to conduct business which at that time is a business concept that is already being undertaken by Shergroup USA, LLC for example:

(a)    on the 1st January 2023 Shergroup Limited open a coffee shop in the UK. Shergroup USA, LLC does not run at that time run a coffee shop in the UK so Shergroup Limited are free to undertake that business;

(b)    on the 20th November 2022 Shergroup USA, LLC open a car garage. On the 15th December 2022, Shergroup Limited would like to open a car garage in the UK. Shergroup Limited cannot open a car garage because of the covenant at 12.6.2(d) unless they first obtain the unanimous consent of the Member's, at that time and that are entitled to vote, of Shergroup USA, LLC.

12.66.3    prior to disposing of all of the shares in Shergroup Limited, Claire Louise Sandbrook shall comply with the following provisions which relate to a grant of first refusal to the Company:

12.6.3.1 Except as provided in Section 12.6.3.4 below, in the event that Claire Louise Sandbrook proposes to sell, exchange, transfer, pledge, or otherwise dispose of all of the shares in Shergroup Limited (the "Transfer Shares") to any person or entity, the Company

shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 12.6.3 (the "Right of First Refusal");

12.6.3.2 If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to Claire Louise Sandbrook of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and Claire Louise Sandbrook shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

12.6.3.3 If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 12.6.3.2 above, Claire Louise Sandbrook may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 12.6.3.2 . Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by Claire Louise Sandbrook, shall again be subject to the Right of First Refusal and shall require compliance by Claire Louise Sandbrook with the procedure described in this Article 12.6.3.

12.6.3.4 The Right of First Refusal shall not apply to any transfer or exchange of all of the shares in Shergroup Limited provided that the transferee is a member of her Relevant Family Provided that, (if applicable) the transferee shall covenant with the Company to comply with the terms of this right of first refusal for the remainder of the Covenant Period.

12.6.3.5 This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

12.6.3.6 Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 12.6.3, all of the Transfer Shares are transferred by Claire Louise Sandbrook to a transferee; the right of first refusal contained within this Article 12.6.3 shall be determined immediately.

12.8 For the purposes of Article 12.6:

12.8.1 any reference to the Business Purpose of Shergroup USA shall be a reference to the Business Purpose of Shergroup USA, LLC as it is defined the day prior to Claire Louise Sandbrook no longer being a Member of Shergroup USA, LLC;

12.8.2 a disposal of a Controlling Interest shall mean a disposal of 51% or more of the shares;

12.8.3 a reference to Claire Louise Sandbrook's Relevant Family is a reference to all, or any, of the following Husband, Son, Daughter, Son in Law, Daughter in Law, granddaughter, grandson and her second cousin Charles Michael Stevens.


## ARTICLE 13

## GENERAL PROVISIONS

**13.1 Amendments**. Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all the Members.

**13.2 Governing Law**. This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Florida (without regard to principles of conflicts of law).

**13.3 Entire Agreement; Modification**. This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

**13.4 Attorney Fees**. In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

**13.5 Further Effect**. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

**13.6 Severability**. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably

construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

13.7 **Captions**. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

13.8 **Notices**. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

13.9 *Membership Voting Interest* means collectively, a Member's right to vote as set forth in this Agreement  The Membership Voting Interest of a Member shall mean as to any matter to which the Member is entitled to vote hereunder,, the right to one (1) vote for each Unit registered in the name of such Member as shown in the Membership Register;

**IN WITNESS WHEREOF**, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

**MEMBERS:**

Claire Sandbrook        Signature: _____
                                            Claire Sandbrook

One World Services,     Signature: _____
LLC a FL LLC
                                            Enrique Sierra

Intrepid Services        Signature: _____
International, LLC a FL
LLC                                        John Johnson

## SCHEDULE 1 – LISTING OF MEMBERS

The following is a list of Members of the Company:

| NAME | ADDRESS |
|---|---|
| Claire Sandbrook | 1420 Celebration Blvd – Suite 200<br>Celebration, FL 34747 |
| One World Services, LLC | 10640 NW 27th Street - Suite A201<br>Doral, FL 33172 |
| Intrepid Services International LLC. | 578 Walden Court<br>Dunedin, FL 34698 |

Authorized by Member(s) to provide Member Listing as of this 23rd day of May 2022.

**MEMBERS:**

Claire Sandbrook        Signature: _____
                        Claire Sandbrook

One World Services,     Signature: _____
LLC a FL LLC            Enrique Sierra

Intrepid Services       Signature: _____
International, LLC, a    John Johnson
FL LLC

## SCHEDULE 2 - LISTING OF MANAGERS

By a majority vote of the Members, the following Managers were elected to operate the Company pursuant to ARTICLE 5 of the Agreement:

| Title | Name | Address |
|---|---|---|
| Manager | Claire Sandbrook | 1420 Celebration Blvd. Suite 200 Celebration, FL 34747 |
| Manager | Enrique Sierra | 10640 NW 27th St Suite A201 Doral, FL 33172 |

The above listed Manager(s) will serve in their capacities until they are removed for any reason by a majority vote of the Members as defined by ARTICLE 45 or upon their voluntary resignation.

Signed and Agreed this 23rd day of May 2022

**MEMBERS:**

Claire Sandbrook        Signature: _____
                                    Claire Sandbrook

One World Services,     Signature: _____
LLC a FL LLC
                                    Enrique Sierra

Intrepid Services       Signature: _____
International, LLC a FL
LLC                                 John Johnson

## SCHEDULE 3 - CAPITAL CONTRIBUTIONS

Pursuant to ARTICLE 3, the Members' initial contribution to the Company capital is stated to be $1,000 USD. The description and each individual portion of this initial contribution is as follows:

| Member | Membership Units | Initial Contribution |
|---|---|---|
| Claire Sandbrook | 250 | $ 250 USD |
| One World Services, LLC a FL LLC | 625 | $ 625 USD |
| Intrepid Services International LLC a FL LLC | 125 | $ 125 USD |
| Total: | 1000 | $ 1,000 USD |

SIGNED AND AGREED this 23rd day of May 2022.

**MEMBERS:**

Claire Sandbrook          Signature: _____
                          Claire Sandbrook

One World Services,       Signature: _____
LLC a FL LLC              Enrique Sierra

Intrepid Services         Signature: _____
International, LLC a FL    John Johnson
LLC

**For assistance with TSDR**, email **teas@uspto.gov** and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.
**TSDR Maintenance -** Documents may be unavailable in TSDR on 05/01/2026 starting from 12:00AM to 05:30AM for a planned system maintenance activity.

STATUS      DOCUMENTS      MAINTENANCE                                    **Back to Search**                    Print

| | |
|---|---|
| **Generated on:** | This page was generated by TSDR on 2026-04-30 15:53:28 EDT |
| **Mark:** | SHERGROUP |

**SHERGROUP**

| | | | |
|---|---|---|---|
| **US Serial Number:** | 99157418 | **Application Filing Date:** | Apr. 27, 2025 |
| **US Registration Number:** | 8058102 | **Registration Date:** | Dec. 09, 2025 |
| **Filed as Base Application:** | Yes | **Currently Base Application:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**

LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

| | |
|---|---|
| **Status:** | Registered. The registration date is used to determine when post-registration maintenance documents are due. |
| **Status Date:** | Dec. 09, 2025 |
| **Publication Date:** | Oct. 21, 2025 |

## Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | SHERGROUP |
| **Standard Character Claim:** | Yes. The mark consists of standard characters without claim to any particular font style, size, or color. |
| **Mark Drawing Type:** | 4 - STANDARD CHARACTER MARK |

## Goods and Services

**Note:**

The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Security guard services; Security guard services for buildings; Security guard services using de-escalation tactics; Providing information relating to security guard services; Provision of information relating to security guard services; Security guard services for the protection of property and individuals; Security services for individuals and business persons traveling internationally and domestically, namely, providing foreign country security briefings, embassy information for security purposes and security reports; Security services for individuals and business persons traveling internationally and domestically; Personal security consultation; Security services, namely, providing executive protection; Providing security surveillance of premises for businesses and governmental agencies; Providing security surveillance of premises for others; Providing a web site featuring information on the development of privacy, security and data governance law; Security threat analysis for protecting personal safety; Store security guard services; Physical security consultancy; Security threat analysis for protecting public safety; Providing information on the development of privacy, security and data governance law via a website; Security due diligence services for individuals or businesses traveling or opening an office overseas, in the nature of detailed foreign country briefings, vetting of local personnel, establishing host country government contacts, and providing information on sustainable security measures overseas; Providing protection for executives being security services; Providing protection for others being security services; Security services for the protection of executives; Providing child protection services being security services; Emergency response alarm monitoring services, namely, monitoring of alert devices by a remote monitoring center for the dispatch of emergency public health and security services and notification to third parties; Conducting personal security clearance background investigations; Consulting and legal services in the field of privacy and security laws, regulations, and requirements; Verifying and monitoring the security credentials of event staff for various private and public sports or entertainment events to ensure public safety; Security services, namely, conducting recovery operations for the recovery of property and personnel; Escort services being security services; Monitoring of computer systems in the nature of surveillance services relating to the physical safety of persons and security of tangible property; Private investigations relating to information technology system security; Consulting services in the field of privacy and security laws relating to software; Investigation services relating to the security of tangible property; Regulatory compliance consultancy in the field of security laws; Provision of protection for others being security services; Provision of information, advice and consultancy in relation to security services for the protection of property and individuals; Monitoring of burglar and security alarms; Security guarding for facilities via remote monitoring systems; Security threat analysis for the physical safety of individuals; Night security guard service; Rental of security dogs; Providing protection services for minors being security services; Surveillance services relating to the physical safety of individuals and security of tangible property; Investigation services relating to the physical safety of individuals and security of tangible property; Investigation and surveillance services relating to the physical safety of individuals and security of tangible property

| **International Class(es):** 045 - Primary Class | **U.S Class(es):** 100, 101 |
|---|---|
| **Class Status:** ACTIVE | |
| **First Use:** Jul. 01, 2007 | **Use in Commerce:** Jul. 01, 2007 |

## Basis Information (Case Level)

| **Filed Use:** Yes | **Currently Use:** Yes |
|---|---|

| | | | |
|---|---|---|---|
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | SHERGROUP GLOBAL CONSULTING LLC |
| **Owner Address:** | 1420 CELEBRATION BLVD<br>SUITE 200<br>CELEBRATION, FLORIDA UNITED STATES 34747 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY |
| **State or Country Where Organized:** | FLORIDA |

## Attorney/Correspondence Information

**Attorney of Record**

| | |
|---|---|
| **Attorney Name:** | NEQUOSHA ANDERSON |
| **Attorney Primary Email Address:** | trademarks@andersonlawfl.com |
| **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | NEQUOSHA ANDERSON<br>ANDERSON LAW FIRM PLLC<br>581 N. Park Ave<br>Suite 2355<br>Apopka, FLORIDA United States 32712 |
| **Phone:** | 1-(407) 801-8000 |
| **Correspondent e-mail:** | trademarks@andersonlawfl.com |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Dec. 09, 2025 | NOTICE OF REGISTRATION CONFIRMATION EMAILED | |
| Dec. 09, 2025 | REGISTERED-PRINCIPAL REGISTER | |
| Oct. 21, 2025 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Oct. 21, 2025 | PUBLISHED FOR OPPOSITION | |
| Oct. 15, 2025 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Sep. 18, 2025 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Sep. 17, 2025 | ASSIGNED TO EXAMINER | 98312 |
| Sep. 05, 2025 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Apr. 27, 2025 | APPLICATION FILING RECEIPT MAILED | |
| Apr. 27, 2025 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

    **Current Location:** FILE REPOSITORY (FRANCONIA)      **Date in Location:** Dec. 09, 2025

## Assignment Abstract Of Title Information - None recorded

## Proceedings - None recorded

Feedback

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Shergroup USA, LLC, Intrepid Services International, LLC, and One World Services, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Julia Hannah Weber & Joseph F. Southron;400 N. Ashley Dr., Ste. 1720, Tampa FL 33602, 813-773-5105

## DEFENDANTS

Claire Sandbrook and Shergroup Global Consulting LLC

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>151 Medicare Act<br>152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholders' Suits<br>190 Other Contract<br>195 Contract Product Liability<br>196 Franchise | **PERSONAL INJURY**<br>310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers' Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>365 Personal Injury - Product Liability<br>367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | 625 Drug Related Seizure of Property 21 USC 881<br>690 Other | 422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>820 Copyrights<br>830 Patent<br>835 Patent - Abbreviated New Drug Application<br>[x] 840 Trademark<br>880 Defend Trade Secrets Act of 2016 | 375 False Claims Act<br>376 Qui Tam (31 USC 3729(a))<br>400 State Reapportionment<br>410 Antitrust<br>430 Banks and Banking<br>450 Commerce<br>460 Deportation<br>470 Racketeer Influenced and Corrupt Organizations<br>480 Consumer Credit (15 USC 1681 or 1692)<br>485 Telephone Consumer Protection Act<br>490 Cable/Sat TV |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | 850 Securities/Commodities/ Exchange |
| 210 Land Condemnation<br>220 Foreclosure<br>230 Rent Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property | 440 Other Civil Rights<br>441 Voting<br>442 Employment<br>443 Housing/ Accommodations<br>445 Amer. w/Disabilities - Employment<br>446 Amer. w/Disabilities - Other<br>448 Education | **Habeas Corpus:**<br>463 Alien Detainee<br>510 Motions to Vacate Sentence<br>530 General<br>535 Death Penalty<br>**Other:**<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br>560 Civil Detainee - Conditions of Confinement | 710 Fair Labor Standards Act<br>720 Labor/Management Relations<br>740 Railway Labor Act<br>751 Family and Medical Leave Act<br>790 Other Labor Litigation<br>791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>462 Naturalization Application<br>465 Other Immigration Actions | **SOCIAL SECURITY**<br>861 HIA (1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g))<br>864 SSID Title XVI<br>865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>870 Taxes (U.S. Plaintiff or Defendant)<br>871 IRS—Third Party 26 USC 7609 | 890 Other Statutory Actions<br>891 Agricultural Acts<br>893 Environmental Matters<br>895 Freedom of Information Act<br>896 Arbitration<br>899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1125(a)(1)(A)

Brief description of cause:
false designation of origin and unfair competition and related breach of contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
5/21/2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Julia Hannah Weber

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.