EXHIBIT -- A

**Date**                23rd day of May                                    2022

**Parties:**

1.    Enrique Sierra, Claire Louise Sandbrook, Greg Wright, John Johnson and Paul Hammond (the "Actual Owners"); and

2.    SHERGROUP USA, LLC (the "Company")


**Recitals**

The Actual Owners have, other than Claire Louise Sandbrook, set up LLC's details of which are below. Each of the LLC's holds a number of Units in the Company details of which are contained within the Operating Agreement of the Company dated the same date as the date hereof.  The Actual Owners believe that their value to the Company means that they should enter into this additional Agreement in order to covenant with the Company as below.


**Operative Clause**

This Agreement is made and entered into on the date first above written.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, it is hereby agreed as follows:


**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

In this Agreement the following terms shall be given the meanings below:

**Actual Owner**. Shall mean:

(a)    in respect of  One World Services, LLC, a Fl LLC Enrique Sierra;

(b)    Claire Louise Sandbrook;

(c)    in respect of One World Services, a FL LLC, Greg Wright;

(d)    in respect of Intrepid Services International, a FL LLC, John Johnson;

(e)    in respect of One World Services, a FL LLC, Paul Hammond;

**Company**. Means Shergroup USA, LLC.

**Covenant Period**. Shall mean, in respect of each of the Actual Owners, a term commencing on the date of this agreement and expiring on the date 2(two) years after the relevant Actual Owner no longer works for/with/at or in any other capacity for the relevant Member.

**Member**. Shall mean each of One World Services, LLC, Claire Louise Sandbrook,  and One World Services, LLC and the term Members shall be construed as a reference to all of them together.

## ARTICLE 2

### ADDITIONAL MEMBERS AND MEMBER CHANGE

2.1  Subject to Article 2.2 below, no new actual owner may be admitted to any of the Members through issuance by the relevant Member of a new interest in the Member without the prior unanimous written consent of the Members.

2.2  Notwithstanding the provisions of Article 2.1 above, for 12 (twelve) month following the date of this Agreement, Claire Louise Sandbrook may transfer all of her Units in the Company to an LLC, that is wholly owned by her, without having to comply with the right of first refusal contained within the Operating Agreement and Article 3 of this Agreement and without requiring the consent of other Members PROVIDED THAT the transferee enters into an agreement with the Company and the Members confirming that they will comply with the terms of the Operating Agreement.

## ARTICLE 3

### RIGHT OF FIRST REFUSAL

3.1  prior to disposing of any Units in the Member the Actual Owner shall comply with the following provisions which relate to a grant of first refusal to the Company:

3.1.1  in the event that an Actual Owner proposes to sell, exchange, transfer, pledge, or otherwise dispose of any of the Units in the relevant Member (the "Transfer Shares") to any person or entity, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 3.1 (the "Right of First Refusal");

3.1.2 If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to the relevant Actual Owner of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and the relevant Actual Owner shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

3.1.3  If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 3.1.2 above, the relevant Actual Owner may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 3.1.2. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the relevant Actual Owner, shall again be subject to the Right of First Refusal and shall require compliance by the relevant Actual Owner with the procedure described in this Article 3.1.

3.1.4  This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

3.1.5  Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 3.1, all of the Transfer Shares are transferred by the relevant Actual Owner to a transferee; the right of first refusal contained within this Article 3.1 shall be determined immediately.

3.1.6 Notwithstanding the provisions of this Article 3, Enrique Sierra may transfer (a) 250 number of Units in Enrique Sierra's Company to Paul Hammond; and (b) 125 number of Units in Enrique Sierra's Company to Greg Wright; such transfers to be made on one occasion, and in one lot each, without complying with the terms of this Article 3.

**ARTICLE 4**

**NON-COMPETE**

4.1 **Covenant Against Unfair Competition.** (a) The Actual Owners acknowledge that pursuant to their positions and/or involvement with the relevant Member, their involvement with the Company is unique and extraordinary and, as a result, the Actual Owners will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Actual Owners to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 4.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Actual Owners agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Actual Owner during their involvement with the Company or the relevant Member, without the prior written consent of the Company; provided, however, that the Actual Owner understands that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

4.2 **Non-Competition.** The Actual Owners agree that during their involvement with the Member and for a period of two (2) years following the termination (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), of the earlier of (a) the relevant Member being a member of the Company; and (b) the Actual Owner having an interest in the relevant Member; they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

> (a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing , specific plans to engage.

> (b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period preceding the termination of the Restrictive Covenant Party's involvement with the Company.

4.3 The Actual Owners recognize the importance of the covenants contained in this Article 4 and acknowledges that, in view of the Actual Owners interest in the Member' and the Members interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Actual Owner' rights as an individual and/or entity. The Actual Owners acknowledge and agree that the covenants contained in this Article 4. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Operating Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the relevant Member or Actual Owner, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 4.

4.4 If the Actual Owner commits a breach or threaten to commit a breach of any of the provisions of this Article 4, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

4.5 If any covenant contained in this Article 4, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Actual Owner breaches the covenants set forth in this Article 4, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 4 shall survive the expiration and termination of this Agreement, and the termination of the Actual Owners involvement with the relevant Member.

**ARTICLE 5**

**Miscellaneous**

5.1 **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to the conflict of laws principles thereof.

5.2 **Notices.** All notices, offers, acceptances, requests and other communications under or pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, with postage prepaid, or sent by facsimile or recognized overnight courier service to the addresses of the Members and the Actual Owners set out in the Operating Agreement. Any party may change his or its address set forth in this Section, by written notification.

5.3.1 **Arbitration.** Notwithstanding anything to the contrary in this Agreement, all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be referred to final and binding arbitration, before an arbitrator (mutually agreeable to the parties to the

claim or dispute) under the arbitration rules of the American Arbitration Association ("AAA") in Miami-Dade County, Florida, except as modified hereby. If the parties to the dispute cannot agree upon the appointment of an arbitrator, each shall appoint one arbitrator and a third arbitrator shall be selected by the two appointed arbitrators within twenty days, following the receipt of written notice of arbitration, as prescribed by AAA. In the event that both appointed arbitrators are unable to select the third arbitrator within a period of twenty days, AAA shall be permitted to submit an appointment.

5.3.2 The arbitrator(s) shall promptly establish a timetable for the completion of arbitration within three months of the selection of the third arbitrator. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than 60 days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or litigation that may arise, and shall not otherwise be disclosed. The rules of AAA shall apply, except as otherwise provided herein.

5.3.3 The arbitrators' award shall be in writing, made by a majority thereof, and include findings of fact and conclusions of law. Judgment upon the award rendered by the arbitrators shall be final, binding and conclusive upon the parties and their respective administrators, executors, legal representatives, heirs, successors and permitted assigns.

5.3.4 The arbitrators shall have the power to award (i) monetary damages, (ii) injunctive relief (preliminary and permanent), and (iii) legal fees and costs associated with the arbitration to the prevailing party. Any party against whom the arbitrators' award shall be issued shall not, in any manner, oppose or defend against any suit to confirm such award, or any enforcement proceedings brought against such party, whether within or outside of the United States, with respect to any judgment entered upon the award, and such party hereby consents to the entry of a judgment against such party, in the full amount thereof, or other relief granted therein, in any court of competent jurisdiction in which such enforcement is sought. The party against whom the arbitrators' award is issued shall pay the arbitrators' fees and each of the parties hereto hereby consents to the jurisdiction of any applicable court of general jurisdiction located in the United States with respect to the entry of such judgment and each irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction or venue of such court.

5.3.5 Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement.

5.4 **Binding Effect**. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of all parties.

5.5 **Partial Invalidity**. In the event that any provision of this Agreement is held by a court or arbitration panel of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court or arbitration panel is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver.** Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC      ...............................

Enrique Sierra         ...............................

Claire Louise Sandbrook...............................

Greg Wright            ...............................

John Johnson           ...............................

Paul Hammond           ...............................

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver.** Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC ..........................

Enrique Sierra ..........................

Claire Louise Sandbrook ..........................

Greg Wright ..........................

John Johnson ..........................

Paul Hammond ..........................

expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 Waiver. Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC    ...............................

Enrique Sierra    ...............................

Claire Louise Sandbrook ...............................

Greg Wright    ...............................

John Johnson    ...............................

Paul Hammond    ...............................

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver.** Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC        ...............................

Enrique Sierra            ...............................

Claire Louise Sandbrook...............................

Greg Wright               ...............................

John Johnson              ...............................

Paul Hammond              ...............................

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

**Date**            23rd day of May                                    2022

**Parties:**

1.      Enrique Sierra, Claire Louise Sandbrook, Greg Wright, John Johnson and Paul Hammond (the
        "Actual Owners"); and

2.      SHERGROUP USA, LLC (the "Company")


**Recitals**

The Actual Owners have, other than Claire Louise Sandbrook, set up LLC's details of which are below.
Each of the LLC's holds a number of Units in the Company details of which are contained within the
Operating Agreement of the Company dated the same date as the date hereof.  The Actual Owners
believe that their value to the Company means that they should enter into this additional Agreement
in order to covenant with the Company as below.


**Operative Clause**

This Agreement is made and entered into on the date first above written.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and
valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the
parties hereto, it is hereby agreed as follows:


## ARTICLE I

### DEFINITIONS AND INTERPRETATION

In this Agreement the following terms shall be given the meanings below:

**Actual Owner.** Shall mean:

(a)     in respect of  One World Services, LLC, a Fl LLC Enrique Sierra;

(b)     Claire Louise Sandbrook;

(c)     in respect of One World Services, a FL LLC, Greg Wright;

(d)     in respect of Intrepid Services International, a FL LLC, John Johnson;

(e)     in respect of One World Services, a FL LLC, Paul Hammond;

**Company.** Means Shergroup USA, LLC.

**Covenant Period.** Shall mean, in respect of each of the Actual Owners, a term commencing on the
date of this agreement and expiring on the date 2(two) years after the relevant Actual Owner no
longer works for/with/at or in any other capacity for the relevant Member.

**Member.** Shall mean each of One World Services, LLC, Claire Louise Sandbrook,  and One World
Services, LLC and the term Members shall be construed as a reference to all of them together.

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

## ARTICLE 2

### ADDITIONAL MEMBERS AND MEMBER CHANGE

2.1  Subject to Article 2.2 below, no new actual owner may be admitted to any of the Members through issuance by the relevant Member of a new interest in the Member without the prior unanimous written consent of the Members.

2.2  Notwithstanding the provisions of Article 2.1 above, for 12 (twelve) month following the date of this Agreement, Claire Louise Sandbrook may transfer all of her Units in the Company to an LLC, that is wholly owned by her, without having to comply with the right of first refusal contained within the Operating Agreement and Article 3 of this Agreement and without requiring the consent of other Members PROVIDED THAT the transferee enters into an agreement with the Company and the Members confirming that they will comply with the terms of the Operating Agreement.

## ARTICLE 3

### RIGHT OF FIRST REFUSAL

3.1  prior to disposing of any Units in the Member the Actual Owner shall comply with the following provisions which relate to a grant of first refusal to the Company:

3.1.1  in the event that an Actual Owner proposes to sell, exchange, transfer, pledge, or otherwise dispose of any of the Units in the relevant Member (the "Transfer Shares") to any person or entity, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 3.1 (the "Right of First Refusal");

3.1.2 If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to the relevant Actual Owner of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and the relevant Actual Owner shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

3.1.3  If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 3.1.2 above, the relevant Actual Owner may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 3.1.2. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the relevant Actual Owner, shall again be subject to the Right of First Refusal and shall require compliance by the relevant Actual Owner with the procedure described in this Article 3.1.

3.1.4  This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

3.1.5  Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 3.1, all of the Transfer Shares are transferred by the relevant Actual Owner to a transferee; the right of first refusal contained within this Article 3.1 shall be determined immediately.

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

3.1.6 Notwithstanding the provisions of this Article 3, Enrique Sierra may transfer (a) 250 number of Units in Enrique Sierra's Company to Paul Hammond; and (b) 125 number of Units in Enrique Sierra's Company to Greg Wright; such transfers to be made on one occasion, and in one lot each, without complying with the terms of this Article 3.

## ARTICLE 4

### NON-COMPETE

4.1 **Covenant Against Unfair Competition.** (a) The Actual Owners acknowledge that pursuant to their positions and/or involvement with the relevant Member, their involvement with the Company is unique and extraordinary and, as a result, the Actual Owners will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Actual Owners to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 4.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Actual Owners agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Actual Owner during their involvement with the Company or the relevant Member, without the prior written consent of the Company; provided, however, that the Actual Owner understands that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

4.2 **Non-Competition.** The Actual Owners agree that during their involvement with the Member and for a period of two (2) years following the termination (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), of the earlier of (a) the relevant Member being a member of the Company; and (b) the Actual Owner having an interest in the relevant Member; they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

> (a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing , specific plans to engage.

> (b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period preceding the termination of the Restrictive Covenant Party's involvement with the Company.

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

4.3 The Actual Owners recognize the importance of the covenants contained in this Article 4 and acknowledges that, in view of the Actual Owners interest in the Member' and the Members interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Actual Owner' rights as an individual and/or entity. The Actual Owners acknowledge and agree that the covenants contained in this Article 4. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Operating Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the relevant Member or Actual Owner, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 4.

4.4 If the Actual Owner commits a breach or threaten to commit a breach of any of the provisions of this Article 4, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

4.5 If any covenant contained in this Article 4, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Actual Owner breaches the covenants set forth in this Article 4, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 4 shall survive the expiration and termination of this Agreement, and the termination of the Actual Owners involvement with the relevant Member.

## ARTICLE 5

### Miscellaneous

5.1 **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to the conflict of laws principles thereof.

5.2 **Notices.** All notices, offers, acceptances, requests and other communications under or pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, with postage prepaid, or sent by facsimile or recognized overnight courier service to the addresses of the Members and the Actual Owners set out in the Operating Agreement. Any party may change his or its address set forth in this Section, by written notification.

5.3.1 **Arbitration.** Notwithstanding anything to the contrary in this Agreement, all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be referred to final and binding arbitration, before an arbitrator (mutually agreeable to the parties to the

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

claim or dispute) under the arbitration rules of the American Arbitration Association ("AAA") in Miami-Dade County, Florida, except as modified hereby. If the parties to the dispute cannot agree upon the appointment of an arbitrator, each shall appoint one arbitrator and a third arbitrator shall be selected by the two appointed arbitrators within twenty days, following the receipt of written notice of arbitration, as prescribed by AAA. In the event that both appointed arbitrators are unable to select the third arbitrator within a period of twenty days, AAA shall be permitted to submit an appointment.

5.3.2 The arbitrator(s) shall promptly establish a timetable for the completion of arbitration within three months of the selection of the third arbitrator. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than 60 days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or litigation that may arise, and shall not otherwise be disclosed. The rules of AAA shall apply, except as otherwise provided herein.

5.3.3 The arbitrators' award shall be in writing, made by a majority thereof, and include findings of fact and conclusions of law. Judgment upon the award rendered by the arbitrators shall be final, binding and conclusive upon the parties and their respective administrators, executors, legal representatives, heirs, successors and permitted assigns.

5.3.4 The arbitrators shall have the power to award (i) monetary damages, (ii) injunctive relief (preliminary and permanent), and (iii) legal fees and costs associated with the arbitration to the prevailing party. Any party against whom the arbitrators' award shall be issued shall not, in any manner, oppose or defend against any suit to confirm such award, or any enforcement proceedings brought against such party, whether within or outside of the United States, with respect to any judgment entered upon the award, and such party hereby consents to the entry of a judgment against such party, in the full amount thereof, or other relief granted therein, in any court of competent jurisdiction in which such enforcement is sought. The party against whom the arbitrators' award is issued shall pay the arbitrators' fees and each of the parties hereto hereby consents to the jurisdiction of any applicable court of general jurisdiction located in the United States with respect to the entry of such judgment and each irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction or venue of such court.

5.3.5 Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement.

5.4 **Binding Effect**. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of all parties.

5.5 **Partial Invalidity**. In the event that any provision of this Agreement is held by a court or arbitration panel of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court or arbitration panel is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement

Docusign Envelope ID: A07CEFB6-FCF5-864C-83CC-D2C4DD594D20

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver.** Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC .....................................

Enrique Sierra .....................................

Claire Louise Sandbrook .....................................

Greg Wright .....................................

John Johnson .....................................

Paul Hammond .....................................

**Date**                23rd day of May                                2022

**Parties:**

1.    Enrique Sierra, Claire Louise Sandbrook, Greg Wright, John Johnson and Paul Hammond (the "Actual Owners"); and

2.    SHERGROUP USA, LLC (the "Company")

**Recitals**

The Actual Owners have, other than Claire Louise Sandbrook, set up LLC's details of which are below. Each of the LLC's holds a number of Units in the Company details of which are contained within the Operating Agreement of the Company dated the same date as the date hereof.  The Actual Owners believe that their value to the Company means that they should enter into this additional Agreement in order to covenant with the Company as below.

**Operative Clause**

This Agreement is made and entered into on the date first above written.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, it is hereby agreed as follows:

**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

In this Agreement the following terms shall be given the meanings below:

**Actual Owner.** Shall mean:

(a)    in respect of  One World Services, LLC, a Fl LLC Enrique Sierra;

(b)    Claire Louise Sandbrook;

(c)    in respect of One World Services, a FL LLC, Greg Wright;

(d)    in respect of Intrepid Services International, a FL LLC, John Johnson;

(e)    in respect of One World Services, a FL LLC, Paul Hammond;

**Company.** Means Shergroup USA, LLC.

**Covenant Period.** Shall mean, in respect of each of the Actual Owners, a term commencing on the date of this agreement and expiring on the date 2(two) years after the relevant Actual Owner no longer works for/with/at or in any other capacity for the relevant Member.

**Member.** Shall mean each of One World Services, LLC, Claire Louise Sandbrook, and One World Services, LLC and the term Members shall be construed as a reference to all of them together.

## ARTICLE 2

### ADDITIONAL MEMBERS AND MEMBER CHANGE

2.1  Subject to Article 2.2 below, no new actual owner may be admitted to any of the Members through issuance by the relevant Member of a new interest in the Member without the prior unanimous written consent of the Members.

2.2  Notwithstanding the provisions of Article 2.1 above, for 12 (twelve) month following the date of this Agreement, Claire Louise Sandbrook may transfer all of her Units in the Company to an LLC, that is wholly owned by her, without having to comply with the right of first refusal contained within the Operating Agreement and Article 3 of this Agreement and without requiring the consent of other Members PROVIDED THAT the transferee enters into an agreement with the Company and the Members confirming that they will comply with the terms of the Operating Agreement.

## ARTICLE 3

### RIGHT OF FIRST REFUSAL

3.1  prior to disposing of any Units in the Member the Actual Owner shall comply with the following provisions which relate to a grant of first refusal to the Company:

3.1.1  in the event that an Actual Owner proposes to sell, exchange, transfer, pledge, or otherwise dispose of any of the Units in the relevant Member (the "Transfer Shares") to any person or entity, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 3.1 (the "Right of First Refusal");

3.1.2 If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to the relevant Actual Owner of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and the relevant Actual Owner shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

3.1.3  If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 3.1.2 above, the relevant Actual Owner may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 3.1.2. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the relevant Actual Owner, shall again be subject to the Right of First Refusal and shall require compliance by the relevant Actual Owner with the procedure described in this Article 3.1.

3.1.4  This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

3.1.5  Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 3.1, all of the Transfer Shares are transferred by the relevant Actual Owner to a transferee; the right of first refusal contained within this Article 3.1 shall be determined immediately.

3.1.6 Notwithstanding the provisions of this Article 3, Enrique Sierra may transfer (a) 250 number of Units in Enrique Sierra's Company to Paul Hammond; and (b) 125 number of Units in Enrique Sierra's Company to Greg Wright; such transfers to be made on one occasion, and in one lot each, without complying with the terms of this Article 3.

## ARTICLE 4

### NON-COMPETE

4.1 **Covenant Against Unfair Competition**. (a) The Actual Owners acknowledge that pursuant to their positions and/or involvement with the relevant Member, their involvement with the Company is unique and extraordinary and, as a result, the Actual Owners will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Actual Owners to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 4.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Actual Owners agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Actual Owner during their involvement with the Company or the relevant Member, without the prior written consent of the Company; provided, however, that the Actual Owner understands that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

4.2 **Non-Competition.** The Actual Owners agree that during their involvement with the Member and for a period of two (2) years following the termination (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), of the earlier of (a) the relevant Member being a member of the Company; and (b) the Actual Owner having an interest in the relevant Member; they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

(a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing , specific plans to engage.

(b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period preceding the termination of the Restrictive Covenant Party's involvement with the Company.

4.3 The Actual Owners recognize the importance of the covenants contained in this Article 4 and acknowledges that, in view of the Actual Owners interest in the Member' and the Members interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Actual Owner' rights as an individual and/or entity. The Actual Owners acknowledge and agree that the covenants contained in this Article 4. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Operating Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the relevant Member or Actual Owner, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 4.

4.4 If the Actual Owner commits a breach or threaten to commit a breach of any of the provisions of this Article 4, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

4.5 If any covenant contained in this Article 4, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Actual Owner breaches the covenants set forth in this Article 4, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 4 shall survive the expiration and termination of this Agreement, and the termination of the Actual Owners involvement with the relevant Member.

## ARTICLE 5

### Miscellaneous

5.1 **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to the conflict of laws principles thereof.

5.2 **Notices.** All notices, offers, acceptances, requests and other communications under or pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, with postage prepaid, or sent by facsimile or recognized overnight courier service to the addresses of the Members and the Actual Owners set out in the Operating Agreement. Any party may change his or its address set forth in this Section, by written notification.

5.3.1 **Arbitration.** Notwithstanding anything to the contrary in this Agreement, all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be referred to final and binding arbitration, before an arbitrator (mutually agreeable to the parties to the

claim or dispute) under the arbitration rules of the American Arbitration Association ("AAA") in Miami-Dade County, Florida, except as modified hereby. If the parties to the dispute cannot agree upon the appointment of an arbitrator, each shall appoint one arbitrator and a third arbitrator shall be selected by the two appointed arbitrators within twenty days, following the receipt of written notice of arbitration, as prescribed by AAA. In the event that both appointed arbitrators are unable to select the third arbitrator within a period of twenty days, AAA shall be permitted to submit an appointment.

5.3.2 The arbitrator(s) shall promptly establish a timetable for the completion of arbitration within three months of the selection of the third arbitrator. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than 60 days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or litigation that may arise, and shall not otherwise be disclosed. The rules of AAA shall apply, except as otherwise provided herein.

5.3.3 The arbitrators' award shall be in writing, made by a majority thereof, and include findings of fact and conclusions of law. Judgment upon the award rendered by the arbitrators shall be final, binding and conclusive upon the parties and their respective administrators, executors, legal representatives, heirs, successors and permitted assigns.

5.3.4 The arbitrators shall have the power to award (i) monetary damages, (ii) injunctive relief (preliminary and permanent), and (iii) legal fees and costs associated with the arbitration to the prevailing party. Any party against whom the arbitrators' award shall be issued shall not, in any manner, oppose or defend against any suit to confirm such award, or any enforcement proceedings brought against such party, whether within or outside of the United States, with respect to any judgment entered upon the award, and such party hereby consents to the entry of a judgment against such party, in the full amount thereof, or other relief granted therein, in any court of competent jurisdiction in which such enforcement is sought. The party against whom the arbitrators' award is issued shall pay the arbitrators' fees and each of the parties hereto hereby consents to the jurisdiction of any applicable court of general jurisdiction located in the United States with respect to the entry of such judgment and each irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction or venue of such court.

5.3.5 Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement.

5.4 **Binding Effect**. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of all parties.

5.5 **Partial Invalidity**. In the event that any provision of this Agreement is held by a court or arbitration panel of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court or arbitration panel is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver.** Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC     ................................

Enrique Sierra     ...............................

Claire Louise Sandbrook...............................

Greg Wright     ...............................

John Johnson     ...............................

Paul Hammond     ...............................

**Date**                23rd day of May                                    2022

**Parties:**

1.      Enrique Sierra, Claire Louise Sandbrook, Greg Wright, John Johnson and Paul Hammond (the "Actual Owners"); and

2.      SHERGROUP USA, LLC (the "Company")


**Recitals**

The Actual Owners have, other than Claire Louise Sandbrook, set up LLC's details of which are below. Each of the LLC's holds a number of Units in the Company details of which are contained within the Operating Agreement of the Company dated the same date as the date hereof.  The Actual Owners believe that their value to the Company means that they should enter into this additional Agreement in order to covenant with the Company as below.


**Operative Clause**

This Agreement is made and entered into on the date first above written.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, it is hereby agreed as follows:


## ARTICLE I

### DEFINITIONS AND INTERPRETATION

In this Agreement the following terms shall be given the meanings below:

**Actual Owner.** Shall mean:

(a)      in respect of  One World Services, LLC, a Fl LLC Enrique Sierra;

(b)      Claire Louise Sandbrook;

(c)      in respect of One World Services, a FL LLC, Greg Wright;

(d)      in respect of Intrepid Services International, a FL LLC, John Johnson;

(e)      in respect of One World Services, a FL LLC, Paul Hammond;

**Company.** Means Shergroup USA, LLC.

**Covenant Period.** Shall mean, in respect of each of the Actual Owners, a term commencing on the date of this agreement and expiring on the date 2(two) years after the relevant Actual Owner no longer works for/with/at or in any other capacity for the relevant Member.

**Member.** Shall mean each of One World Services, LLC, Claire Louise Sandbrook,  and One World Services, LLC and the term Members shall be construed as a reference to all of them together.

## ARTICLE 2

### ADDITIONAL MEMBERS AND MEMBER CHANGE

2.1  Subject to Article 2.2 below, no new actual owner may be admitted to any of the Members through issuance by the relevant Member of a new interest in the Member without the prior unanimous written consent of the Members.

2.2  Notwithstanding the provisions of Article 2.1 above, for 12 (twelve) month following the date of this Agreement, Claire Louise Sandbrook may transfer all of her Units in the Company to an LLC, that is wholly owned by her, without having to comply with the right of first refusal contained within the Operating Agreement and Article 3 of this Agreement and without requiring the consent of other Members PROVIDED THAT the transferee enters into an agreement with the Company and the Members confirming that they will comply with the terms of the Operating Agreement.

## ARTICLE 3

### RIGHT OF FIRST REFUSAL

3.1  prior to disposing of any Units in the Member the Actual Owner shall comply with the following provisions which relate to a grant of first refusal to the Company:

3.1.1  in the event that an Actual Owner proposes to sell, exchange, transfer, pledge, or otherwise dispose of any of the Units in the relevant Member (the "Transfer Shares") to any person or entity, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 3.1 (the "Right of First Refusal");

3.1.2  If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to the relevant Actual Owner of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and the relevant Actual Owner shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

3.1.3  If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 3.1.2 above, the relevant Actual Owner may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 3.1.2. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the relevant Actual Owner, shall again be subject to the Right of First Refusal and shall require compliance by the relevant Actual Owner with the procedure described in this Article 3.1.

3.1.4  This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

3.1.5  Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 3.1, all of the Transfer Shares are transferred by the relevant Actual Owner to a transferee; the right of first refusal contained within this Article 3.1 shall be determined immediately.

3.1.6 Notwithstanding the provisions of this Article 3, Enrique Sierra may transfer (a) 250 number of Units in Enrique Sierra's Company to Paul Hammond; and (b) 125 number of Units in Enrique Sierra's Company to Greg Wright; such transfers to be made on one occasion, and in one lot each, without complying with the terms of this Article 3.

**ARTICLE 4**

**NON-COMPETE**

4.1 **Covenant Against Unfair Competition.** (a) The Actual Owners acknowledge that pursuant to their positions and/or involvement with the relevant Member, their involvement with the Company is unique and extraordinary and, as a result, the Actual Owners will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Actual Owners to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 4.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Actual Owners agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Actual Owner during their involvement with the Company or the relevant Member, without the prior written consent of the Company; provided, however, that the Actual Owner understands that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

4.2 **Non-Competition.** The Actual Owners agree that during their involvement with the Member and for a period of two (2) years following the termination (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), of the earlier of (a) the relevant Member being a member of the Company; and (b) the Actual Owner having an interest in the relevant Member; they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

> (a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing , specific plans to engage.

> (b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period preceding the termination of the Restrictive Covenant Party's involvement with the Company.

4.3 The Actual Owners recognize the importance of the covenants contained in this Article 4 and acknowledges that, in view of the Actual Owners interest in the Member' and the Members interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Actual Owner' rights as an individual and/or entity. The Actual Owners acknowledge and agree that the covenants contained in this Article 4. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Operating Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the relevant Member or Actual Owner, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 4.

4.4 If the Actual Owner commits a breach or threaten to commit a breach of any of the provisions of this Article 4, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

4.5 If any covenant contained in this Article 4, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Actual Owner breaches the covenants set forth in this Article 4, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 4 shall survive the expiration and termination of this Agreement, and the termination of the Actual Owners involvement with the relevant Member.

## ARTICLE 5

### Miscellaneous

5.1 **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to the conflict of laws principles thereof.

5.2 **Notices.** All notices, offers, acceptances, requests and other communications under or pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, with postage prepaid, or sent by facsimile or recognized overnight courier service to the addresses of the Members and the Actual Owners set out in the Operating Agreement. Any party may change his or its address set forth in this Section, by written notification.

5.3.1 **Arbitration.** Notwithstanding anything to the contrary in this Agreement, all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be referred to final and binding arbitration, before an arbitrator (mutually agreeable to the parties to the

claim or dispute) under the arbitration rules of the American Arbitration Association ("AAA") in Miami-Dade County, Florida, except as modified hereby. If the parties to the dispute cannot agree upon the appointment of an arbitrator, each shall appoint one arbitrator and a third arbitrator shall be selected by the two appointed arbitrators within twenty days, following the receipt of written notice of arbitration, as prescribed by AAA. In the event that both appointed arbitrators are unable to select the third arbitrator within a period of twenty days, AAA shall be permitted to submit an appointment.

5.3.2 The arbitrator(s) shall promptly establish a timetable for the completion of arbitration within three months of the selection of the third arbitrator. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than 60 days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or litigation that may arise, and shall not otherwise be disclosed. The rules of AAA shall apply, except as otherwise provided herein.

5.3.3 The arbitrators' award shall be in writing, made by a majority thereof, and include findings of fact and conclusions of law. Judgment upon the award rendered by the arbitrators shall be final, binding and conclusive upon the parties and their respective administrators, executors, legal representatives, heirs, successors and permitted assigns.

5.3.4 The arbitrators shall have the power to award (i) monetary damages, (ii) injunctive relief (preliminary and permanent), and (iii) legal fees and costs associated with the arbitration to the prevailing party. Any party against whom the arbitrators' award shall be issued shall not, in any manner, oppose or defend against any suit to confirm such award, or any enforcement proceedings brought against such party, whether within or outside of the United States, with respect to any judgment entered upon the award, and such party hereby consents to the entry of a judgment against such party, in the full amount thereof, or other relief granted therein, in any court of competent jurisdiction in which such enforcement is sought. The party against whom the arbitrators' award is issued shall pay the arbitrators' fees and each of the parties hereto hereby consents to the jurisdiction of any applicable court of general jurisdiction located in the United States with respect to the entry of such judgment and each irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction or venue of such court.

5.3.5 Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement.

5.4 **Binding Effect.** This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of all parties.

5.5 **Partial Invalidity.** In the event that any provision of this Agreement is held by a court or arbitration panel of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court or arbitration panel is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement

of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 **Waiver**. Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC    ...............................

Enrique Sierra    ...............................

Claire Louise Sandbrook...............................

Greg Wright    ...............................

John Johnson

Paul Hammond

Date    23rd Day of May                                                        2022

**Parties:**

1.    Enrique Sierra, Claire Louise Sandbrook, Greg Wright, John Johnson and Paul Hammond (the "Actual Owners"); and

2.    SHERGROUP USA, LLC (the "Company")

**Recitals**

The Actual Owners have , other than Claire Louise Sandbrook, set up LLC's details of which are below. Each of the LLC's holds a number of Units in the Company details of which are contained within the Operating Agreement of the Company dated the same date as the date hereof. The Actual Owners believe that their value to the Company means that they should enter into this additional Agreement in order to covenant with the Company as below.

**Operative Clause**

This Agreement is made and entered into on the date first above written.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, it is hereby agreed as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

In this Agreement the following terms shall be given the meanings below:

**Actual Owner.** Shall mean:

(a)    in respect of One World Services, LLC a Fl LLC Enrique Sierra;

(b)    Claire Louise Sandbrook;

(c)    in respect of One World Services LLC, a FL LLC Greg Wright;

(d)    in respect of Intrepid Services International, LLC a FL LLC, John Johnson;

(e)    in respect of One World Services, LLC, a FL LLC Paul Hammond;

**Company.** Means Shergroup USA, LLC.

**Covenant Period.** Shall mean, in respect of each of the Actual Owners, a term commencing on the date of this agreement and expiring on the date 2(two) years after the relevant Actual Owner no longer works for/with/at or in any other capacity for the relevant Member.

**Member.** Shall mean each of One World Services, LLC a FL LLC, Claire Louise Sandbrook; and Intrepid Services, LLC a FL LLC and the term Members shall be construed as a reference to all of them together.

## ARTICLE 2

## ADDITIONAL MEMBERS AND MEMBER CHANGE

2.1  Subject to Article 2.2 below, no new actual owner may be admitted to any of the Members through issuance by the relevant Member of a new interest in the Member without the prior unanimous written consent of the Members.

2.2  Notwithstanding the provisions of Article 2.1 above, for 12 (twelve) month following the date of this Agreement, Claire Louise Sandbrook may transfer all of her Units in the Company to an LLC, that is wholly owned by her, without having to comply with the right of first refusal contained within the Operating Agreement and Article 3 of this Agreement and without requiring the consent of other Members PROVIDED THAT the transferee enters into an agreement with the Company and the Members confirming that they will comply with the terms of the Operating Agreement.

## ARTICLE 3

## RIGHT OF FIRST REFUSAL

3.1  prior to disposing of any Units in the Member the Actual Owner shall comply with the following provisions which relate to a grant of first refusal to the Company:

3.1.1  in the event that an Actual Owner proposes to sell, exchange, transfer, pledge, or otherwise dispose of any of the Units in the relevant Member (the "Transfer Shares") to any person or entity, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Article 3.1 (the "Right of First Refusal");

3.1.2  If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares at the purchase price and on the terms set forth in the Transfer Notice by delivery to the relevant Actual Owner of a notice of exercise of the Right of First Refusal within thirty (30)days after the date the Transfer Notice is delivered to the Company. If the Company exercises the Right of First Refusal, the Company and the relevant Actual Owner shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60)days after the date the Transfer Notice is delivered to the Company.

3.1.3  If the Company fails to exercise the Right of First Refusal in full within the time period detailed in Article 3.1.2 above, the relevant Actual Owner may conclude a transfer to another transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90)days following delivery to the Company of the Transfer Notice or, if applicable, following the end of the period described in the last sentence of Article 3.1.2. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the relevant Actual Owner, shall again be subject to the Right of First Refusal and shall require compliance by the relevant Actual Owner with the procedure described in this Article 3.1.

3.1.4  This right of first refusal granted to the Company shall not be assignable to any third party and shall be personal to the Company;

3.1.5  Upon the earlier of (a) expiry of the Covenant Period; or (b) having complied with the right of first refusal contained within this Article 3.1, all of the Transfer Shares are transferred by the relevant Actual Owner to a transferee; the right of first refusal contained within this Article 3.1 shall be determined immediately.

3.1.6 Notwithstanding the provisions of this Article 3, Enrique Sierra may transfer (a) [   ] number of Units in Enrique Sierra's Company to Paul Hammond; and (b) [   ] number of Units in Enrique Sierra's Company to Greg Wright; such transfers to be made on one occasion, and in one lot each, without complying with the terms of this Article 3.

## ARTICLE 4

## NON-COMPETE

4.1 **Covenant Against Unfair Competition.** (a) The Actual Owners acknowledge that pursuant to their positions and/or involvement with the relevant Member, their involvement with the Company is unique and extraordinary and, as a result, the Actual Owners will be in possession of confidential information relating to the business practices of the Company. The term "confidential information" shall mean any and all information (verbal and written) relating to the Company or any of its subsidiaries, affiliates or clients, or any of their respective activities, other than such information which can be shown by the Actual Owners to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of breach of the provisions of this Article 4.1, including but not limited to information relating to: trade secrets, personnel lists, client lists and prospects, financial information, research, investment strategies and objectives, investment methodologies, investment performance, services used, pricing, product sourcing, marketing strategies and methods, and other proprietary information. The Actual Owners agree that they will not, during or at any time after the termination of their involvement with the Company, directly or indirectly, use, communicate, disclose or disseminate to any person, firm or corporation any confidential information regarding the clients, customers or business practices of the Company acquired by the Actual Owner during their involvement with the Company or the relevant Member, without the prior written consent of the Company; provided, however, that the Actual Owner understands that they will be prohibited from misappropriating any trade secret at any time during or after the termination of their involvement with the Company.

4.2 **Non-Competition.** The Actual Owners agree that during their involvement with the Member and for a period of two (2) years following the termination (for any reason, except that if the Company is dissolved and/or otherwise ceases to engage in business, the non-competition provisions of this subparagraph 12.2 shall not apply and shall be otherwise null and void), of the earlier of (a) the relevant Member being a member of the Company; and (b) the Actual Owner having an interest in the relevant Member; they will not, for their own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation, or other legal entity, as principal, agent or otherwise:

(a) engage in the business of providing services similar to the Company's services to businesses in which the Company engages in or in which the Company has an actual intention, as evidenced by the Company's then existing , specific plans to engage.

(b) directly or indirectly, solicit or induce, and/or in any manner attempt to solicit or induce, any person employed by the Company or any of its subsidiaries or affiliates to leave such employment, whether or not such employment is pursuant to a written contract and whether or not such employment is at will, or hire any person who has been employed by the Company or any of its subsidiaries or affiliates at any time during the six (6) month period

preceding the termination of the Restrictive Covenant Party's involvement with the Company.

4.3 The Actual Owners recognize the importance of the covenants contained in this Article 4 and acknowledges that, in view of the Actual Owners interest in the Member' and the Members interest in and/or involvement with the Company, the worldwide nature of the Company's activities, the projected expansion of the Company's business, and the potential ability of a competitor located anywhere in the world to harm the Company's interests, the restrictions imposed herein are: (i) reasonable as to scope, time and area; (ii) necessary for the protection of the Company's legitimate business interests, including without limitation, the Company's trade secrets, goodwill, and its relationship with customers and suppliers; and (iii) not unduly restrictive of any the Actual Owner' rights as an individual and/or entity. The Actual Owners acknowledge and agree that the covenants contained in this Article 4. are essential elements of this Agreement and that but for these covenants, the Company would not have agreed to enter into this Operating Agreement. Such covenants shall be construed as agreements independent of any other provision of this Agreement. The existence of any claim or cause of action against the Company by the relevant Member or Actual Owner, whether predicated on the breach of this Agreement or otherwise, shall not constitute a defence to the enforcement by Company of the covenants contained in Article 4.

4.4 If the Actual Owner commits a breach or threaten to commit a breach of any of the provisions of this Article 4, the Company shall have the right and remedy, in addition to any others that may be available, at law or in equity, to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief, it being acknowledged that any such breach or threatened breach will cause irreparable injury to the Company, the amount of which will be difficult to determine, and that money damages will not provide an adequate remedy to the Company.

4.5 If any covenant contained in this Article 4, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenants, which shall be given full effect, without regard to the invalid portions, and any court having jurisdiction shall have the power to reduce the duration, scope and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable. If the Actual Owner breaches the covenants set forth in this Article 4, the running of the non-compete period described herein (but not their obligation) shall be tolled for so long as such breach continues. The provisions of this Article 4 shall survive the expiration and termination of this Agreement, and the termination of the Actual Owners involvement with the relevant Member.

## ARTICLE 5

### Miscellaneous

5.1 Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to the conflict of laws principles thereof.

5.2 Notices. All notices, offers, acceptances, requests and other communications under or pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, certified or registered mail, with postage prepaid, or sent by facsimile or recognized overnight courier service to the addresses of the Members and the Actual Owners set out in the Operating Agreement. Any party may change his or its address set forth in this Section, by written notification.

5.3.1 Arbitration. Notwithstanding anything to the contrary in this Agreement, all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be referred to final and binding arbitration, before an arbitrator (mutually agreeable to the parties to the claim or dispute) under the arbitration rules of the American Arbitration Association ("AAA") in Miami-Dade County, Florida, except as modified hereby. If the parties to the dispute cannot agree upon the appointment of an arbitrator, each shall appoint one arbitrator and a third arbitrator shall be selected by the two appointed arbitrators within twenty days, following the receipt of written notice of arbitration, as prescribed by AAA. In the event that both appointed arbitrators are unable to select the third arbitrator within a period of twenty days, AAA shall be permitted to submit an appointment.

5.3.2 The arbitrator(s) shall promptly establish a timetable for the completion of arbitration within three months of the selection of the third arbitrator. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than 60 days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or litigation that may arise, and shall not otherwise be disclosed. The rules of AAA shall apply, except as otherwise provided herein.

5.3.3 The arbitrators' award shall be in writing, made by a majority thereof, and include findings of fact and conclusions of law. Judgment upon the award rendered by the arbitrators shall be final, binding and conclusive upon the parties and their respective administrators, executors, legal representatives, heirs, successors and permitted assigns.

5.3.4 The arbitrators shall have the power to award (i) monetary damages, (ii) injunctive relief (preliminary and permanent), and (iii) legal fees and costs associated with the arbitration to the prevailing party. Any party against whom the arbitrators' award shall be issued shall not, in any manner, oppose or defend against any suit to confirm such award, or any enforcement proceedings brought against such party, whether within or outside of the United States, with respect to any judgment entered upon the award, and such party hereby consents to the entry of a judgment against such party, in the full amount thereof, or other relief granted therein, in any court of competent jurisdiction in which such enforcement is sought. The party against whom the arbitrators' award is issued shall pay the arbitrators' fees and each of the parties hereto hereby consents to the jurisdiction of any applicable court of general jurisdiction located in the United States with respect to the entry of such judgment and each irrevocably submits to the jurisdiction of such courts and waives any objection it may have to either the jurisdiction or venue of such court.

5.3.5 Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement.

5.4 Binding Effect. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of all parties.

5.5 Partial Invalidity. In the event that any provision of this Agreement is held by a court or arbitration panel of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court or arbitration panel is

expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as modified by the court or the arbitration panel shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

5.6 Waiver. Any failure by a party hereto to comply with any obligation, agreement or condition herein may be expressly waived, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals, the Company by its duly authorized officers, the day and year first above written.

Shergroup USA, LLC .................................

Enrique Sierra .................................

Claire Louise Sandbrook.................................

Greg Wright .................................

John Johnson .................................

Paul Hammond .................................