**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

SHERGROUP USA, LLC, INTREPID
SERVICES INTERNATIONAL, LLC,
and ONE WORLD SERVICES, LLC,

        Plaintiffs,                     Case No. 6:26-cv-01128-RBD-RMN

      v.

CLAIRE SANDBROOK and
SHERGROUP GLOBAL CONSULTING
LLC,

        Defendants.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

Plaintiffs, Shergroup USA, LLC, Intrepid Services International, LLC, and One World Services, LLC (collectively, "Plaintiffs"), by and through the undersigned counsel, and pursuant to the Federal Rules of Civil Procedure and the Local Rules for the Middle District of Florida, hereby file this Response in Opposition to Defendants, Claire Sandbrook ("Sandbrook") and Shergroup Global Consulting LLC's ("SGC") (collectively "Defendants"), Motion to Compel Arbitration, filed on July 21, 2026 at Doc. # 20, and in support thereof states as follows:

1.     Plaintiff Shergroup USA, LLC is a Florida limited liability company providing security and high court enforcement services, and has used the "Shergroup" name and mark in United States commerce since 2011. Doc. # 1 ¶¶

17–19. On May 23, 2022, Shergroup's members (Sandbrook, Plaintiff One World Services, LLC, and Plaintiff Intrepid Services International, LLC) entered into an Operating Agreement, a true and correct copy of which is attached to the Complaint as Exhibit A. Doc. # 1 ¶ 28; Doc. # 1-1.

2.      The Operating Agreement is governed by Florida law, constitutes "the entire understanding and agreement between the Members with respect to the subject matter of this Agreement," and requires unanimous written signature for any modification. Doc. # 1-1, Arts. 13.2, 13.3. It also imposes certain restrictive covenants on each Member and provides that they may be "specifically enforced by any court having equity jurisdiction, through injunctive or other relief." Doc. # 1-1, Art. 12.4. The Operating Agreement contains no arbitration provision.

3.      Before her dissociation, Sandbrook formed Defendant SGC and caused SGC to file a USPTO application for the word mark "SHERGROUP." Doc. # 1 ¶¶ 6, 56–63. Sandbrook dissociated from Shergroup USA shortly thereafter. Doc. # 1 ¶ 5.

4.      Plaintiffs filed this twelve-count Complaint on May 21, 2026, bringing claims for breach of the Operating Agreement, Florida statutory and common law claims, federal Lanham Act claims, and declaratory judgment, and seeking injunctive relief on each count. *See generally* Doc. # 1.

5.      On July 21, 2026, Defendants moved to compel arbitration on the basis of the "Side Bar Agreement," executed by Sandbrook, as an individual and

2

on behalf of Shergroup USA, and the individuals owning the LLC members of Shergroup USA, on May 23, 2022. Doc. # 20 ¶¶ 11, 13.

6.      Article 5.3.1 provides for arbitration of "all claims or disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement." Doc. # 20-1, Art. 5.3.1. Article 5.3.5 provides that "[n]otwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement." *Id.* at Art. 5.3.5.

7.      SGC filed its Answer in this action on June 16, 2026, pleading a single affirmative defense. It did not raise or reserve the right to arbitrate. *See* Doc. # 8 at 15. Both Defendants moved to compel arbitration by the instant motion.

8.      Every cause of action in the Complaint arises from the Operating Agreement, or else from federal or Florida law; the Side Bar Agreement's arbitration clause reaches none of them. For the reasons set forth below, the motion should be denied.

## LEGAL STANDARD

On a motion to compel arbitration under the Federal Arbitration Act, the Eleventh Circuit considers first, "whether the parties agreed to arbitrate the dispute" and, second, "whether 'legal constraints external to the parties' agreement foreclosed arbitration.'" *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). The presumption of arbitrability applies only

3

where supported by "a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed . . . and best construed to encompass the dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010).

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Calderon v. Sixt Rent A Car, LLC*, 5 F.4th 1204, 1208 (11th Cir. 2021) (applying Florida law "because the parties agree that Florida law governs [the] interpretation" of the contract containing the arbitration clause).

Under Florida law, "the determination of whether an arbitration clause requires arbitration of a particular dispute necessarily 'rests on the intent of the parties.'" *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) (quoting *Seaboard Coast Line R.R. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982)). With respect to arbitration provisions or agreements that require arbitration for claims "relating to" the subject contract, Florida courts have held that the claims at issue must have a "significant relationship" to the contract. *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (citing *Seifert*, 750 So. 2d at 637–38). Florida courts describe a "significant relationship" as follows:

> [A] significant relationship is described to exist between an arbitration provision and a claim if there is a "contractual nexus" between the claim and the contract. A

> contractual nexus exists between a claim and a contract if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract. More specifically, a claim has a nexus to a contract and arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship. In contrast, a claim does not have a nexus to a contract if it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as a duty under the general common law owed not only to the contracting parties but also to third parties and the public.

*Jackson*, 108 So. 3d at 593 (internal citations omitted).

The Eleventh Circuit applies the same limit to the FAA's own "arising out of" text in 9 U.S.C. § 2. A dispute "does not arise out of or in connection with a contract" for the purposes of arbitration "just because the dispute would not have arisen if the contract had never existed." *Calderon*, 5 F.4th at 1212–13. Rather, the operative test asks whether the parties "could have performed the arbitrable contract perfectly, fulfilling all expectations under that contract, and still be embroiled in this dispute." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1220 (11th Cir. 2011) (quoting *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1368–69 (11th Cir. 2008)). Where "claims are not 'an immediate, foreseeable result of the performance' of the parties' contractual duties . . . they are not within the scope of the arbitration clause." *Doe*, 657 F.3d at 1220 (quoting *Hemispherx*, 553 F.3d at 1367).

## ARGUMENT

### I.    The Pled Claims Do Not Relate to the Side Bar Agreement.

No contractual nexus exists between any pled count and the Side Bar Agreement. Every count arises from the Operating Agreement, from Florida statutory duties owed to a limited liability company and its members, or from

federal trademark law. None arises from the Side Bar Agreement. Under applicable law, therefore, the Side Bar Agreement does not require arbitration for any pled claim.

### A. *The pled counts bear no significant relationship to the Side Bar Agreement.*

None of the pled counts meet *Jackson*'s significant-relationship test, which applies as the Side Bar Agreement contains a Florida choice-of-law provision. Doc. # 20-1, Art. 5.1. The Complaint does not rest on, nor does any count reference, the Side Bar Agreement, nor does any count require reference to, or construction of, any portion of the Side Bar Agreement. No count emanates from an "inimitable duty" created by the parties' relationship as parties to that document either. *Jackson*, 108 So. 3d at 593. Each count instead arises from the Operating Agreement, from a statutory duty imposed on every Member of a Florida limited liability company, or from a common law duty owed to third parties and the public. Those are the duties *Jackson* expressly placed outside the nexus. *Id.*

Counts I, II, XI, and XII arise from the Operating Agreement. They plead breach of Article 12's restrictive covenants (Counts I and II), fraudulent inducement to enter the Operating Agreement (Count XI), and declaratory relief on the Operating Agreement's restrictive covenants (Count XII). Doc. # 1 ¶¶ 115–126, 200–212. Resolving each requires the Court to reference and construe the Operating Agreement, not the Side Bar Agreement. And each pleads breach of

6

a duty created by the Operating Agreement, not by any relationship between the parties as parties to the Side Bar Agreement.

Counts III (breach of fiduciary duty under Fla. Stat. § 605.04091) and IV (wrongful dissociation under Fla. Stat. § 605.0601) arise from Florida statute and plead breaches of duties imposed by law on every Member and Manager of a Florida limited liability company. Doc. # 1 ¶¶ 125–137. Both claims fall squarely within *Jackson*'s "duty otherwise imposed by law" carve-out. *Jackson*, 108 So. 3d at 593. Sandbrook's status as a Member and Manager derives from the Operating Agreement, not the Side Bar Agreement. Doc. # 1-1, Art. 5.2, Sched. 1. The Side Bar Agreement confers no such status and imposes no such duties.

Counts V through X arise from federal statute and common law duties owed to the public. Count V pleads common law tortious interference with Shergroup USA's third-party business relationships. Doc. # 1 ¶¶ 138–148. Counts VI and VII plead false designation of origin and unfair competition under 15 U.S.C. § 1125(a). Doc. # 1 ¶¶ 149–171. Count VIII pleads Florida common law trademark infringement and unfair competition. Doc. # 1 ¶¶ 172–182. Counts IX and X plead cancellation and fraudulent procurement of U.S. Trademark Registration No. 8,058,102 under 15 U.S.C. §§ 1119 and 1120. Doc. # 1 ¶¶ 183–199. Resolving each of these counts requires reference to statute or common law, not to any provision of the Side Bar Agreement. Furthermore, each pleads breach of a duty owed to third parties or to the public generally not to deceive consumers as to source or to interfere with existing business relations. Those are

7

the duties *Jackson* expressly placed outside the significant-relationship nexus. *Jackson*, 108 So. 3d at 593. Under *Jackson* and its Eleventh Circuit progeny, Article 5.3.1 does not reach any pled count.

### B. Even under Doe, no count falls within the scope of the Side Bar Agreement.

Even applying the Eleventh Circuit's operative scope test, where the parties could have fully performed the Side Bar Agreement and still ended up in this dispute, the relevant claims fall outside its arbitration scope. *Doe*, 657 F.3d at 1220. The Side Bar Agreement's substantive obligations are limited to ownership-succession mechanics (Arts. 2, 3), a general confidentiality covenant (Art. 4.1), a general non-competition covenant (Art. 4.2), and dispute-resolution mechanics (Art. 5). Doc. # 20-1. Full performance of those obligations does not perform, discharge, or resolve the duties Plaintiffs plead as breached. Every pled count could have arisen with full performance of the Side Bar Agreement.

Counts I and II plead breach of Operating Agreement Article 12, including Article 12.66, the Sandbrook-Specific Covenants. Doc. # 1 ¶¶ 115–124. Article 12.66 governs Sandbrook's relationship with Shergroup Limited (a United Kingdom entity) and has no Side Bar Agreement counterpart. Doc. # 1-1, Art. 12.66. Sandbrook could have performed every Side Bar Agreement obligation and still breached Article 12.66, for example by causing Shergroup Limited to service United States clients within Shergroup USA's Business Purpose. As to the Article 12.1 and 12.2 aspects of Counts I and II, the Operating Agreement's

confidentiality and non-competition covenants and the Side Bar Agreement's parallel covenants at Article 4 are separately enforceable duties arising from separate contracts. Full performance of one does not perform the other. Plaintiffs' pled Operating Agreement dispute invokes Operating Agreement rights and the Operating Agreement's specific equity remedy at Article 12.4. Doc. # 1-1, Art. 12.4. That Operating Agreement dispute survives whatever hypothetical Side Bar Agreement claim the same conduct might also support.

Counts III and IV plead statutory duties Sandbrook owes as a Member and Manager of Shergroup USA under Fla. Stat. §§ 605.04091 and 605.0601. Doc. # 1 ¶¶ 125–137. Sandbrook's Member and Manager status derives from the Operating Agreement, not the Side Bar Agreement. Doc. # 1-1, Sched. 1, Art. 5.2, Sched. 2. Full performance of the Side Bar Agreement does not discharge or perform any statutory duty. Count V pleads common law tortious interference against Sandbrook and SGC. Doc. # 1 ¶¶ 138–148. The duty at issue is a common law duty owed to third parties, not an obligation of the Side Bar Agreement.

Counts VI, VII, and VIII plead Lanham Act and Florida common law trademark and unfair-competition claims against Sandbrook and SGC. Doc. # 1 ¶¶ 149–182. Each rests on duties owed to consumers and the public not to deceive as to the source of goods or services. None is a Side Bar Agreement obligation. Counts IX and X are pled against SGC alone. SGC is not a party to the Side Bar Agreement. Doc. # 20 ¶ 11. SGC has no Side Bar Agreement obligations to perform. Whether SGC could have performed the arbitrable contract perfectly

9

is not a coherent question. Counts IX and X therefore fall outside the arbitration clause under *Doe*.

Count XI pleads fraudulent inducement of the Operating Agreement. It rests on misrepresentations Sandbrook made about Shergroup USA's financial condition and the ownership of the Shergroup name. Doc. # 1 ¶¶ 200–207. That pre-contractual conduct was complete before any Side Bar Agreement obligation could be performed. Finally, Count XII seeks declaratory relief on the Operating Agreement's restrictive covenants. Doc. # 1 ¶¶ 208–212. Nothing in the Side Bar Agreement resolves a dispute about the Operating Agreement's text. Every pled count therefore survives full performance of the Side Bar Agreement and falls outside the arbitration clause's scope under the *Doe* test.

### C. Arbitrability is a threshold question for this Court.

Defendants ask the Side Bar Agreement's arbitration clause to be read to delegate gateway questions, including "scope, enforceability, and arbitrability," to the arbitrator, and they ask this Court to send those questions to arbitration on that basis. Doc. # 20 at 11. The clause does not carry that consequence. Plaintiffs contend that the Side Bar Agreement's arbitration clause does not reach the pled claims at all. That scope-across-contracts question belongs to this Court.

Arbitration is a matter of consent, and courts should order arbitration only where satisfied that the parties agreed to arbitrate the dispute. *Granite Rock*, 561 U.S. at 297. Delegation clauses do not commit gateway questions to an arbitrator

absent "clear and unmistakable" evidence of intent. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

*Parnell v. CashCall, Inc.* does not require a different result. The delegation holding there rested on contract text defining "Disputes" to include "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement." 804 F.3d 1142, 1148 (11th Cir. 2015). No comparable text appears in the Side Bar Agreement. In fact, the Side Bar Agreement's own text confirms the same result. Article 5.3.1 commits to arbitration only claims "relating in any way to the performance, interpretation, validity, or breach of this Agreement." Doc. # 20-1, Art. 5.3.1. "This Agreement" is the Side Bar Agreement. Whether the clause reaches claims pled under a different contract or under federal and state statutes is not a question its text delegates.

## II. The Operating Agreement Forecloses Arbitration of Counts I and II and Reserves Equity Court Jurisdiction Over Article 12.

The Operating Agreement governs Counts I and II. Those counts plead breach of Operating Agreement Article 12.1 (Count I) and Articles 12.2 and 12.66 (Count II). Doc. # 1 ¶¶ 116, 119–124. The Operating Agreement contains no arbitration provision, and two of the Operating Agreement's own provisions independently foreclose sending Article 12 disputes to arbitration. Article 13.3 integrates the Operating Agreement and bars using any separate writing to modify its subject matter without unanimous written signature, thereby foreclosing a reading of the Operating Agreement together with any other

separate writing. Article 12.4 expressly reserves equity court jurisdiction for the very Article 12 covenants at issue in Counts I and II.

### A. *The Operating Agreement and the Side Bar Agreement cannot be read as a single contract.*

Defendants ask the Court to read the Operating Agreement and the Side Bar Agreement together as one contract. Doc. # 20 at 10. Defendants do so precisely because the applicable case law interpreting the subject arbitration agreement does not compel a finding that the claims pled here are arbitrable. But applicable law does not permit reading the Operating Agreement and Side Bar Agreement together.

Contemporaneous documents may be construed together only where they are "executed by the same parties, at or near the same time and concerning the same transaction or subject matter." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 648 (11th Cir. 1992). Moreover, only where "a writing expressly refers to and sufficiently describes another document," may the other document, "or so much of it as is referred to," be interpreted as part of the same writing. *Pier 1 Cruise Experts, Corp. v. Revelex Corp.*, 929 F.3d 1334, 1340–41 (11th Cir. 2019) (quoting *Quix Snaxx, Inc. v. Sorensen*, 710 So. 2d 152, 153 (Fla. 3d Dist. Ct. App. 1998)). The applicable agreements fail these predicates. They were not executed by the same parties, do not concern the same subject matter, and neither sufficiently describes the other (in fact the Operating Agreement does not refer at all to the Side Bar Agreement). The Side Bar Agreement, for its part, refers to the Operating Agreement only in three narrow contexts unrelated to

12

arbitration: a recital reference to the Operating Agreement as the source of Unit details, a limited 12-month waiver of one Operating Agreement right of first refusal for Sandbrook, and a notice-address reference. Doc. # 20-1 at 2, Arts. 2.2, 5.2. The agreements therefore should not be construed together.

Article 13.3 of the Operating Agreement further plainly forecloses treating any separate writing as adding to or modifying its Article 12 subject matter. Doc. # 1-1, Art. 13.3. Article 13.3 provides that "[n]o agreements, understandings, restrictions, representations, or warranties exist between or among the members other than those in this Agreement or referred to in this Agreement," and that "[n]o modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members." *Id.* Two consequences follow. First, the Operating Agreement is the entire agreement between the Members with respect to its subject matter, which includes the Article 12 restrictive covenants pled in Counts I and II. *Id.* at Arts. 12.1, 12.2, 12.66. Second, no separate writing modifies any provision of the Operating Agreement absent every Member's signature. Under Florida law, the plain language of a contract controls its interpretation. *Jackson*, 108 So. 3d at 593. The Side Bar Agreement cannot function as an "understanding" or an "amendment" of Article 12's subject matter absent every Member's written signature. *Id.* at Art. 13.3.

The consequence for Counts I and II is direct. Counts I and II plead breach of Operating Agreement Article 12. Doc. # 1 ¶¶ 116, 119–124. Whether the Side

Bar Agreement's arbitration clause reaches those counts is a question of whether the Side Bar Agreement modified or supplemented Article 12's subject matter to include arbitration. Article 13.3 answers that question in the negative. The Operating Agreement is the entire agreement between the Members on Article 12 subject matter. The Operating Agreement does not send Article 12 disputes to arbitration.

### B. Article 12.4 reserves equity court jurisdiction for Counts I and II.

Article 12.4 of the Operating Agreement expressly reserves equity court jurisdiction to the Company for any breach of Article 12, providing that the Company "shall have the right and remedy . . . to have the provisions of this Article 12 specifically enforced by any court having equity jurisdiction, through injunctive or other relief." Doc. # 1-1, Art. 12.4.

Article 12.4 is not a boilerplate remedies clause; it is a bargained-for allocation of forum for Article 12 disputes, and Sandbrook agreed to it when she signed the Operating Agreement. *Id.* at Sched. 1. Article 12.4 covers Counts I and II on the face of the Complaint: Articles 12.1, 12.2, and 12.66 are each "provisions of this Article 12" and Plaintiffs seek injunctive relief on both counts. Doc. # 1 ¶¶ 116, 119–126; Counts I, II Prayers for Relief.

Even if the Side Bar Agreement's arbitration clause otherwise reached Counts I and II (it does not), Article 12.4 would still commit those counts to this Court. Under Florida law, a contract is interpreted to give effect to every

14

provision. *Jackson*, 108 So. 3d at 593. Article 12.4 is a provision that must be given effect. Reading the Side Bar Agreement's arbitration clause to displace Article 12.4 would either amount to an unwritten modification of the Operating Agreement (barred by Article 13.3) or nullify Article 12.4 entirely (barred by ordinary contract-interpretation principles). The correct reading gives effect to both. Article 12.4 reserved Article 12 enforcement to a court of equity when Sandbrook signed the Operating Agreement, and it still does.

## III.   Article 5.3.5 Preserves Plaintiffs' Right to Seek Injunctive Relief in this Court.

Even if the Court concludes that the Side Bar Agreement's arbitration clause reaches any of the pled claims, the motion still fails as to every claim for which Plaintiffs seek injunctive relief. Article 5.3.5 of the Side Bar Agreement is an unqualified reservation of the parties' right to seek injunctive relief in a court of law to enforce any provision of the Side Bar Agreement. Plaintiffs pray for injunctive relief on every count of the Complaint. Article 5.3.5 therefore keeps every count in this Court, even under Defendants' broadest reading of the arbitration clause. Article 5.3.5 provides: "Notwithstanding the foregoing, the parties may at any time seek injunctive relief in a court of law in order to enforce the provisions of this Agreement." Doc. # 20-1, Art. 5.3.5.

Under settled law, this Court enforces the plain terms of an arbitration agreement, including any express carve-out. *See, e.g., Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (the FAA "does

15

not require parties to arbitrate when they have not agreed to do so, . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement").

Three features of Article 5.3.5's text control. First, the provision opens with "Notwithstanding the foregoing," which by its plain terms yields the entire preceding arbitration architecture in Section 5.3 to what follows. Second, the reservation runs to "the parties" without limitation as to which party or which kind of dispute. Third, the reservation permits a court of law to enforce "the provisions of this Agreement," not "the provisions of Section 5.3.1" or "the arbitration clause."

The Florida Third District Court of Appeal enforced a materially identical carve-out in *1906 Collins LLC v. Chibras Romero,* holding that a carve-out reserving injunctive relief in "any court of competent jurisdiction" to restrain non-solicitation and non-competition breaches "unambiguously excludes" those claims from arbitration. 346 So. 3d 1262, 1266 (Fla. Dist. Ct. App. 3d Dist. 2022).

Article 5.3.5 does the same work here, and reaches further: it reserves injunctive-relief jurisdiction to "the parties," in a court of law, "to enforce the provisions of this Agreement," without limitation. Defendants read Article 5.3.5 as permitting only injunctions "to enforce the arbitration provision." Doc. # 20 ¶ 16. That is not what Article 5.3.5 says. The reservation actually applies to enforcement of "the provisions" of the Agreement, plural and without limitation,

including, on Defendants' own account, the Agreement's ownership-succession, transfer-restriction, and non-competition covenants. Doc. # 20 ¶¶ 12–13.

Plaintiffs pray for injunctive relief on every count of the Complaint. Doc. # 1. That relief includes orders restraining Sandbrook's continued use of Shergroup USA's confidential information, requiring Sandbrook and SGC to relinquish administrative control over the Company's digital assets, restraining Defendants' unauthorized use of the Shergroup mark, and canceling U.S. Trademark Registration No. 8,058,102. Every count therefore falls within Article 5.3.5's reservation.

Under Article 5.3.5's plain text and the settled rule that carve-outs from arbitration are enforced according to the parties' expressed intent, this Court has jurisdiction to grant the injunctive relief Plaintiffs seek on every count. Defendants' contrary reading would rewrite "the provisions of this Agreement" as "the arbitration provision." The Court should reject that rewrite.

## IV. SGC Separately Cannot Compel Arbitration and Has Waived Any Right to Try.

Even if the claims against Sandbrook are arbitrable, those against SGC are not. SGC is not a party to the Side Bar Agreement, and could not have been as it was not formed until April 18, 2025, approximately three years later. Doc. # 8 ¶ 56 (admitting formation date). Arbitration is a matter of consent, and a "party cannot be required to submit to arbitration any dispute which he has not agreed

17

so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal citations and quotation omitted).

Defendants seek to bridge that gap through non-signatory equitable estoppel under Florida law, invoking *Armas v. Prudential Securities, Inc.*, 842 So. 2d 210 (Fla. Dist. Ct. App. 3d Dist. 2003). Doc. # 20 at 16. Controlling Eleventh Circuit authority has substantially narrowed that doctrine. Florida equitable estoppel permits a non-signatory to compel arbitration "only when the claims asserted against [it] fall within the scope of the clause that the signatories had agreed upon." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1357 (11th Cir. 2017). The doctrine reaches only where the signatory "must actually depend on the underlying contract to make out his or her claim against the nonsignatory." *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1088 (11th Cir. 2024). "To actually rely on the contract, the signatory's claims 'must attempt to hold the non-signatory to the terms of the contract.'" *Id.* (quoting *Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1343 (11th Cir. 2012)). Plaintiffs' claims against SGC plainly do not depend on the Side Bar Agreement. *See supra* § IV.A.1. SGC cannot invoke Florida equitable estoppel here.

SGC has also waived any right to compel arbitration. Waiver in the arbitration context is "the intentional relinquishment or abandonment of a known right," and after *Morgan v. Sundance, Inc.*, prejudice is no longer required to establish it. 596 U.S. 411, 417, 419 (2022). The Eleventh Circuit's current post-*Morgan* test asks whether, "under the totality of the circumstances,

18

the party has acted inconsistently with the arbitration right." *Bedgood v. Wyndham Vacation Resorts, Inc.*, 88 F.4th 1355, 1369 (11th Cir. 2023) (internal citation and quotation omitted). Waiver is implicated if a party has "'invoked the litigation machinery' before reversing course and claiming that arbitration was the proper avenue all along." *Payne v. Savannah Coll. of Art & Design, Inc.*, 81 F.4th 1187, 1201 (11th Cir. 2023) (internal citation omitted). Waiver may turn on whether the movant engaged in extensive use of the litigation process, alerted the opposing party before suit that arbitration was required, and promptly filed a motion to compel. *Id.*

SGC was served on May 26, 2026, and filed its Answer on the merits on June 16, 2026 without pleading or reserving arbitration. Doc. # 8 at 15. SGC gave Plaintiffs no notice, before suit or in its Answer, that any claim against SGC must be arbitrated. Two months after being served, and another five weeks after SGC filed its Answer, SGC joined Sandbrook in the present motion. Filing an answer on the merits without asserting or reserving arbitration is inconsistent conduct sufficient to support waiver, and SGC has therefore forfeited any right to compel arbitration.

## CONCLUSION

The Side Bar Agreement is not the operative contract for any pled claim. The Operating Agreement, which governs the Counts I and II covenant claims, contains no arbitration provision and expressly reserves equity court jurisdiction for the Article 12 covenants at issue. Even were the Side Bar Agreement to reach

any pled claim, its own Article 5.3.5 preserves this Court's jurisdiction over every claim on which Plaintiffs seek injunctive relief.

WHEREFORE, Plaintiffs Shergroup USA, LLC, Intrepid Services International, LLC, and One World Services, LLC respectfully request that this Court deny Defendants' Motion to Compel Arbitration and Incorporated Memorandum of Law (Doc. # 20), and grant Plaintiffs such other and further relief as the Court deems just and proper.

Dated: <u>August 4, 2026.</u>

Respectfully submitted,

<u>/s/ Julia Hannah Weber</u>
Julia Hannah Weber
Florida Bar No. 1045592
Joseph F. Southron, Esq.
Florida Bar No. 122109
**SOUTHRON FIRM, P.A.**
400 N. Ashley Drive, Suite 1720
Tampa, Florida 33602
Tel. (813) 773-5105
Fax (813) 683-4338
julia.weber@southronfirm.com
joe@southronfirm.com
eservice@southronfirm.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed on August 4, 2026, with the Court via CM/ECF system, which will send notification of such filing to all parties and counsel of record.

<u>/s/ Julia Hannah Weber</u>
Julia Hannah Weber
